IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

UNITED STATES OF AMERICA     . CASE NO. 5:17-HC-2008-BO
                                 . ELIZABETH CITY, NC
V.                                   . JANUARY 10, 2018
                                  .
RICHARD SCHMIDT                 .
. . . . . . . . . . . . . . . . . .

TRANSCRIPT OF 4248 BENCH TRIAL
BEFORE THE HONORABLE TERRENCE W. BOYLE
JUDGE, UNITED STATES DISTRICT COURT


APPEARANCES:

FOR THE UNITED STATES:     MICHAEL G. JAMES, ESQUIRE
                            RUDY E. RENFER, ESQUIRE
                            ASSISTANT U.S. ATTORNEY
                            800 FEDERAL BUILDING
                            310 NEW BERN AVENUE
                            RALEIGH, NC  27601-1461


FOR THE DEFENDANT:        RAYMOND C. TARLTON, ESQUIRE
                            TARLTON POLK PLLC
                            150 FAYETTEVILLE STREET, #930
                            RALEIGH, NC  27601


COURT REPORTER:         MS. SANDRA A. GRAHAM, CVR

Proceedings recorded by stenomask, transcript produced from
dictation.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646     sgrahamassoc@gmail.com

I-N-D-E-X

EXAMINATION OF THE WITNESSES

|                          | DIRECT | CROSS | REDIRECT | RECROSS |
|--------------------------|--------|-------|----------|---------|
| **RICHARD SCHMIDT**      |        |       |          |         |
| BY MR. JAMES             | 5      |       | 44       |         |
| BY MR. TARLTON           |        | 37    |          |         |
| **DR. ROBIN WATKINS**    |        |       |          |         |
| BY MR. RENFER            | 47     |       |          |         |
| BY MR. TARLTON           |        | 63    |          |         |
| **DR. GARY ZINIK**       |        |       |          |         |
| BY MR. JAMES             | 64     |       |          |         |
| BY MR. TARLTON           |        | 79    |          |         |
| **DR. FABIAN SALEH**     |        |       |          |         |
| BY MR. TARLTON           | 81     |       |          |         |
| BY MR. JAMES             |        | 95    |          |         |
| **DR. JOSEPH PLAUD**     |        |       |          |         |
| BY MR. TARLTON           | 105    |       |          |         |
| BY MR. JAMES             |        | 118   |          |         |
| **MOTION TO DISMISS**    | 128    |       |          |         |

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

1   **THE COURT:** Good morning.

2   **MR. TARLTON:** Good morning, Your Honor.

3   **MR. JAMES:** Good morning, Your Honor.

4   **THE COURT:** This is United States versus Schmidt, a 4248

5   hearing.

6   **MR. JAMES:** That's correct, Your Honor.

7   **THE COURT:** Are we ready to proceed?

8   **MR. TARLTON:** Yes, Your Honor.

9   **MR. JAMES:** If I could just do a couple of house cleaning

10   matters.

11   **THE COURT:** Yes.

12   **MR. JAMES:** First, I have been authorized by Dr. Watkins --

13   she is one of the experts in this case. I've been

14   authorized to tell the Court this. She had a child

15   recently, and she needs to express at around 11:30, if

16   that's okay with the Court.

17   **THE COURT:** I couldn't hear you.

18   **MR. JAMES:** She needs to express breast milk --

19   **THE COURT:** Okay.

20   **MR. JAMES:** -- at about 11:30, 11:30 to 12:00 o'clock, if

21   it's okay with the Court.

22   **THE COURT:** Okay. Whatever.

23   **MR. JAMES:** The second thing, Your Honor, I've spoken with

24   Mr. Tarlton, and we have agreed, one, to the entry of the

25   notebooks as exhibits in Court.

1    **THE COURT:** Okay.

2    **MR. JAMES:** That's the first thing. The second thing, we

3    have stipulated as to I believe Prongs 1 and 2.

4    **THE COURT:** Okay.

5    **MR. JAMES:** On this Adam Walsh matter. That is the first

6    prong, Mr. Schmidt has previously engaged or attempted to

7    engage in an act of child molestation and suffers from a

8    serious mental illness, abnormality or disorder. And I

9    believe that's what has come out in all the reports from

10    every expert in the case, whether it is the Respondent's

11    experts or the Government's experts, said that Mr. Schmidt

12    suffers from a pedophilic disorder, sexually attracted to

13    males. So I think that's it. Oh, and we also stipulate to

14    the Court that each of these experts are in fact experts.

15    **THE COURT:** Do what?

16    **MR. JAMES:** That each of the experts who are testifying are

17    in fact experts.

18    **THE COURT:** Yeah, okay.

19    **MR. JAMES:** Without needing further qualification.

20    **THE COURT:** Okay. Are you ready to call your first

21    witness?

22    **MR. JAMES:** Yes, sir. We are going to call Mr. Schmidt

23    first.

24    **THE COURT:** Okay.

25    **MR. JAMES:** The Respondent.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646     sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 4 of 134

1       **RICHARD SCHMIDT, RESPONDENT, SWORN**

2                       DIRECT EXAMINATION

3       **BY MR. JAMES:**

4       Q.   Good morning, Mr. Schmidt.

5       A.   Good morning.

6       Q.   Mr. Schmidt, I'm going to walk right into it.

7            Mr. Schmidt, you were convicted on August 30, 1984 in

8       a guilty plea to a third degree sexual offense.  Is that

9       correct?

10      A.   That's correct.

11      Q.   And you were 41 years old at the time; is that

12      correct?

13      A.   That's correct.

14      Q.   And that was your first arrest; is that correct?

15      A.   Yes.

16      Q.   You were sentenced on October 1, 1904 to three years

17      imprisonment suspended up to six months and three years

18      probation.  Is that correct?

19      A.   Yes.

20      Q.   And you also had some provisions, which was to attend

21      and successfully complete Johns Hopkins School of Medicine

22      Biosexual Clinic?

23      A.   Not at that time.  Not after the first arrest.  I

24      think we discussed that before.  It was after the second

25      conviction that I was to go to Johns Hopkins.

1    Q.   Okay.  All right.  The victims in that case were two

2    boys, ages 10 and 9 years old; is that correct?

3    A.   Yes.

4    Q.   You were also convicted on May 10th, 1985 of third

5    degree sexual offense and fourth degree sexual offense; is

6    that correct?

7    A.   Yes.

8    Q.   You were sentenced on October 16, 1985 to two years on

9    the third degree sexual offense and eight years on the

10    fourth degree sexual offense; is that correct?

11    A.   Yes.

12    Q.   All time was suspended with credit for time served and

13    you were put on five years probation.  Is that correct?

14    A.   Yes.

15    Q.   And the special condition was that you would report to

16    Johns Hopkins and agree to Depo-Provera.  That's the

17    injection to lower your testosterone.  Do you remember

18    that?

19    A.   Yes.

20    Q.   The victims in that case were boys who were ten and

21    eleven years old; is that correct?

22    A.   Yes.

23    Q.   You were discharged from the Johns Hopkins Sex

24    Offender Treatment Program on October 22, 1986 when staff

25    saw you in Patterson Park, a park in Maryland, with boys.

1    A.   When I was seen in Patterson Park I was observing a
2    soccer game.
3    Q.   A staff member from Johns Hopkins saw you; and,
4    therefore, you were discharged from the program?
5    A.   That's correct.
6    Q.   And you weren't supposed around boys at the time?
7    A.   (Nod head).  That's correct.
8    Q.   And you're nodding.  You have to be audible, for the
9    record.
10   A.   Okay.
11   Q.   Thank you.  Now the second offense that you were
12   convicted of, you committed that offense after you had been
13   arrested on the first offense but not sentenced yet; is
14   that correct?
15   A.   Yes.
16   Q.   And when you were convicted -- excuse me -- when you
17   were arrested on the first offense your entire world was
18   destroyed, wasn't it?
19   A.   I didn't hear.
20   Q.   Your entire world was destroyed, wasn't it?
21   A.   Things were pretty bad, yes.
22   Q.   Because prior to that you had been -- you had owned a
23   Radio Shack store.
24   A.   Yes.
25   Q.   And you lost that store, you lost your home, your

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646     sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 7 of 134

1   mortgage was foreclosed on your home.  You lost associates

2   and friends.  Isn't that correct?

3   A.   Yes.

4   Q.   In fact at the time that you engaged in the

5   molestation with the ten or eleven year old boy from the

6   May 10, 1985 conviction you used sex as a coping mechanism.

7   Isn't that correct?

8   A.   Well, actually I hadn't lost everything at that point.

9   It was after the second arrest that I lost everything

10  because I was still at that time I owned a video store in

11  Calvert County where that arrest took place.  So I still

12  had some substance to my life at that point, so I can't say

13  that it was just a coping mechanism, because I was not

14  completely destitute at that time.

15  **THE COURT:**  Let me ask some questions.

16       You were born in '42?

17  A.   Yes, sir.

18  **THE COURT:**  And where were you born?

19  A.   Born in Baltimore, Maryland.

20  **THE COURT:**  And is that where your family lived?

21  A.   Yes.

22  **THE COURT:**  Did you grow up as a child in Baltimore?

23  A.   Part of the time was in Baltimore.

24  **THE COURT:**  Where else?

25  A.   I lived in Severna Park.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 8 of 134

1    **THE COURT:**  Is that in Maryland?

2    A.   Yes, near Annapolis.

3    **THE COURT:**  Did you go to grammar school?

4    A.   Yes.

5    **THE COURT:**  What kind of a grammar school, public school?

6    A.   Public school, yeah.

7    **THE COURT:**  When were you in the eighth grade, in the '50s?

8    A.   Uh, yeah.

9    **THE COURT:**  Think about it.

10   A.   Yeah.

11   **THE COURT:**  Did you go to high school?

12   A.   Yes.

13   **THE COURT:**  Where?

14   A.   I went to a private school, Severn School, in

15   Maryland.

16   **THE COURT:**  What's the name of it?

17   A.   Severn.

18   **THE COURT:**  Severn?

19   A.   Yes.

20   **THE COURT:**  Is that the name of the river?

21   A.   Yes.

22   **THE COURT:**  And where was that school?

23   A.   That was in Severna Park where I lived.

24   **THE COURT:**  And where is that near?

25   A.   It is in between Annapolis and Baltimore.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 9 of 134

1    **THE COURT:**  Okay.  Did you graduate from high school?

2    A.   Yeah.

3    **THE COURT:**  What did you study in high school?

4    A.   It was general.

5    **THE COURT:**  Pre-college or trade?

6    A.   Pre-college.

7    **THE COURT:**  Did you graduate in '59?

8    A.   '61.

9    **THE COURT:**  '61.  Were you late for your class?

10   A.   I transferred from a high school and I didn't have

11   enough credits.

12   **THE COURT:**  So you should have graduated earlier?

13   A.   Should have graduated in '60.  I graduated in '61.

14   **THE COURT:**  And then what did you do when you graduated

15   from high school?

16   A.   I went to the University of Maryland.

17   **THE COURT:**  You were 19 or so?

18   A.   Yes, 19.

19   **THE COURT:**  Where is it, in College Park?

20   A.   Yeah.

21   **THE COURT:**  And you were a freshman there?

22   A.   Yes.

23   **THE COURT:**  Did you live in a dorm?

24   A.   Yes.

25   **THE COURT:**  And what did you study?  What were you

1    intending to study?

2    A.   Well, I studied -- majored in agriculture and arts and

3    science.

4    **THE COURT:**  Did you stay there, did you finish?

5    A.   No.  I stayed there a year and a half.

6    **THE COURT:**  Then you left?

7    A.   Then I left, yes, sir.

8    **THE COURT:**  And what happened when you left?

9    A.   When I left I went to a community college.

10   **THE COURT:**  Where was that?

11   A.   That was in Anne Arundel County, for one semester.

12   **THE COURT:**  Were you registered for the draft?

13   A.   Well, they didn't -- they didn't give draft notices if

14   you were in college.

15   **THE COURT:**  Okay.  And so you had a deferment?

16   A.   I had a deferment until I left the community college.

17   **THE COURT:**  And when did you leave the community college?

18   A.   What year?

19   **THE COURT:**  Was it '64?

20   A.   I think it might have been '64 or '63.

21   **THE COURT:**  Okay.  Were you in the service?

22   A.   Yeah.

23   **THE COURT:**  What branch.

24   A.   Army.

25   **THE COURT:**  And when did you go in the Army?

1    A.   That was 1964.

2    **THE COURT:**  And were you an enlisted man?

3    A.   I enlisted, yes.

4    **THE COURT:**  No, I mean you weren't an officer; you were an

5    enlisted man?

6    A.   Exactly.

7    **THE COURT:**  So you were an E-1, E-2, E-3, E-4?

8    A.   Right.

9    **THE COURT:**  How high up did you go?

10   A.   I went up to E-4.

11   **THE COURT:**  Okay.  Did you complete your service in the

12   Army?

13   A.   Yes, three years.

14   **THE COURT:**  And when were you discharged?

15   A.   In '66.

16   **THE COURT:**  Okay.  And where were you living then?

17   A.   Pardon?

18   **THE COURT:**  Where were you living then?

19   A.   I was -- you mean when I got out of the Army?

20   **THE COURT:**  Correct.

21   A.   I went back to my parents' house.

22   **THE COURT:**  So you were 22 then?

23   A.   Yes.

24   **THE COURT:**  Okay.  Then did you continue your education?

25   A.   Yes.  I went to Towson University.

1    **THE COURT:**  Where?

2    A.   Towson University.

3    **THE COURT:**  Towson?

4    A.   Towson University.

5    **THE COURT:**  In Maryland.

6    A.   That's a university in Baltimore, Maryland, yes.

7    **THE COURT:**  Did you graduate from there?

8    A.   Yes, I did.

9    **THE COURT:**  What kind of degree did you get?

10   A.   I had a degree in education, a Bachelor of Science

11   degree.

12   **THE COURT:**  Okay.  And then did you get a job?

13   A.   Yes.

14   **THE COURT:**  As a teacher?

15   A.   Yes.

16   **THE COURT:**  In the public school?

17   A.   Yes.

18   **THE COURT:**  Where?

19   A.   Anne Arundel County Public School.

20   **THE COURT:**  Okay.  And that was in '67?

21   A.   It was later than that, because it took me several

22   years because I was working part time when I went to

23   college, so it would have been in the early '70s.

24   **THE COURT:**  All right.  Thank you.  Go ahead.

25   **EXAMINATION BY MR. JAMES:**

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO  Document 62  Filed 01/22/18  Page 13 of 134

1    Q.   Just following up on the Court's questions, you were
2    an elementary school teacher from '73 to '79; is that
3    correct?
4    A.   I didn't quite hear you.  I'm a little hard of
5    hearing.
6    Q.   Okay.  You were an elementary school teacher from 1973
7    to '79; isn't that correct?
8    A.   Yes, correct.
9    Q.   And when you graduated from college you had a Bachelor
10   of Science in Elementary Education?
11   A.   Yes.
12   Q.   You also coached children; is that correct?
13   A.   Yes.
14   Q.   You had also worked as a lifeguard during the
15   summertime when you were not teaching; is that correct?
16   A.   Yes.
17   Q.   And this occurred -- about '73 you were -- that was
18   when you were in your '30s.  Is that --
19   A.   Yes.
20   Q.   Approximately?  Okay.  And during the summertime when
21   you were not teaching, in your '30s, you had a sexual
22   relationship with a 13 year old boy; is that correct?
23   A.   During the time that I was not teaching?
24   Q.   In the summertime, during the summertime.  You know,
25   you have teachers teach from the fall until sometime in May

1   or June and then everyone is off for their summer, right?

2   A.   Yes.

3   Q.   And during those summer months you were working as a

4   lifeguard.

5   A.   Correct.

6   Q.   At the beach?

7   A.   Right.

8   Q.   And you met a 13 year old boy during that period of

9   time; isn't that correct?

10  A.   Yes.

11  Q.   And you engaged in sexual contact with that boy; isn't

12  that correct?

13  A.   Yes.

14  **THE COURT:**  Were you attracted to women or not?

15  A.   Somewhat, but not a strong attraction.

16  **THE COURT:**  Did you have relations with any women when you

17  were --

18  A.   I had a few girlfriends and did date.

19  **THE COURT:**  Did you --

20  A.   Not extensively.

21  **THE COURT:**  I'm sorry?

22  A.   Not extensively.

23  **THE COURT:**  Did you have intercourse with them?

24  A.   No.

25  **THE COURT:**  You never did?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646     sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 15 of 134

1    A.   No.

2    **THE COURT:**  Have you ever?

3    A.   No.

4    **THE COURT:**  Okay.

5    Q.   To follow up on the Court's question, you did not

6    report to any of the experts that you had a sexual

7    attraction to women; is that correct?

8    A.   I didn't --

9    Q.   You did not report to any of the experts that you had

10   a sexual attraction to women.  Isn't that correct?

11   A.   Well, I'm sure I didn't do that.  I don't know whether

12   I was asked that question directly.  The only attractions I

13   had was during my teenage years.  After that I didn't have

14   sexual attractions insomuch as I was dating.

15   Q.   Well, you have never had an intimate relationship with

16   a woman?

17   A.   That's correct.

18   Q.   You have never had -- aside from a sexual intimacy,

19   you have never had a personal relationship with a woman;

20   isn't that correct?

21   A.   Only occasionally dating.  Nothing interpersonal or

22   anything involving a serious relationship, that's correct.

23   Q.   Would you be surprised that -- I don't believe in any

24   of the expert reports there is any reference to you dating

25   a woman.  Would you be surprised to know that?

1    A.   I don't know whether I was ever asked that question or

2    not.

3    Q.   Now, when you were having sexual contact with the 13

4    year old boy, what attracted you to the boys is the fact

5    that their skin was smooth, they looked young and their

6    body was hairless; is that correct?

7    A.   Yes.

8    Q.   And the sexual contact you had with the boys included

9    you and the boys being naked and you would rub them; is

10   that correct?

11   A.   Yes.

12   Q.   Rub their genitals.  Is that correct?

13   A.   Again?

14   Q.   Rub their genitals.

15   A.   Yeah.

16   Q.   Is that correct?

17   A.   Yes.

18   Q.   All right.  You would lay on top of them?

19   A.   Yes.

20   Q.   And this molestation occurred in your home; isn't that

21   correct?

22   A.   Yeah.

23   Q.   And you would -- stayed with the 13 year old boy for

24   maybe a year, maybe two years, in terms of having sexual

25   contact with him; is that correct?

1   A.   Could have been up to three years.

2   Q.   Could have been up to three years having sexual

3   conduct with the boy.

4   A.   Or several years.  I always had an ongoing

5   relationship.

6   Q.   And in fact during the months when you were a teacher

7   and teaching, you cannot say -- you've got no report that

8   you've ever had sexual contact with a boy during the time

9   you were teaching?

10  A.   That's correct.

11  Q.   Now, in '79 and '80, that's when you opened up the

12  store.  You had a partner at that point, Mr. Snaub?

13  A.   Yes.

14  Q.   And you began sponsoring a lacrosse team; isn't that

15  correct?

16  A.   Yes.

17  Q.   And in fact the ten year old boy that was your first

18  offense would come into the store.  Isn't that correct?

19  A.   Yes.

20  Q.   All right.  And you believed that the boy was

21  interested in you because he would come into the store and

22  show just general interest in you?

23  A.   Yes.

24  Q.   And based on that you invited the boy to spend the

25  night with you; isn't that correct?

1  A.   Yes.

2  Q.   And at one point you took the boy home to his mother

3  from lacrosse practice; is that correct?

4  A.   Yes.

5  Q.   And you met the boy's mother?

6  A.   Yes.

7  Q.   And you asked the boy's mother if the boy could have

8  permission to stay with you?

9  A.   Yes.

10  Q.   And the boy had no father in the home; isn't that

11  correct?

12  A.   Correct.

13  Q.   And you would agree that the boy came from what you

14  would consider a lower middle class family?

15  A.   Yes.

16  Q.   And the boy had visited the store about five times

17  before you molested him; is that correct?

18  A.   Yes.

19  Q.   And the boy brought his nine year old brother along

20  for the overnight stay; is that correct?

21  A.   Yes.

22  Q.   And you sexually molested both boys?

23  A.   Yes.

24  Q.   You were arrested around April 26, 1984.  Is that

25  correct?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646     sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 19 of 134

1    A.   Yes.

2    Q.   And that was your first arrest?

3    A.   Yes.

4    Q.   Do you remember at your deposition stating that your

5    world fell apart at that time?

6    A.   Can you repeat that?

7    Q.   Do you remember at your deposition at page 54 you

8    stated that your world fell apart at that time, after the

9    first arrest?

10   A.   Yes.

11   Q.   And you were held for, I believe, a couple of hours,

12   and then you were released.

13   A.   Yes.

14   Q.   Then you went on to sexually offend with the second

15   set of victims, the ten and 11 year old boys.  Isn't that

16   correct?

17   A.   Yes.

18   Q.   And those boys also came to the store that you owned?

19   A.   It wasn't the same store.

20   Q.   Oh, this was a different store?

21   A.   Yes.

22   Q.   All right.  And the molestation occurred which you

23   were fondling the boys' body, rubbing their legs.

24   A.   Yes.

25   Q.   Their bare chests?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646     sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 20 of 134

1    A.   Did they what?

2    Q.   Their bare chests, putting your hands under their

3    clothing.

4    A.   I recall it being on the back.

5    Q.   You were then released and you had a -- you were

6    arrested in 1985 on a number of cases that were nolle

7    prossed.  They declined prosecution after awhile.  Do you

8    recall that?

9    A.   Yes.

10   Q.   And in one of the matters you told Dr. Hastings that

11   there was a bricklayer you met who had three sons.

12   A.   Yes.

13   Q.   I'll use their initials.  One was an eleven year old

14   named LK.  There was an eight year old whose initials were

15   CK.  There was another child whose initials were RK.  You

16   slept in the basement of that bricklayers home where the

17   boys were; is that correct?

18   A.   I was living there?

19   Q.   Yes.

20   A.   Yeah.

21   Q.   And you tried to kiss LK on the mouth and hug him; is

22   that correct?

23   A.   Never kissed anybody on the mouth.

24   Q.   Did you tell Dr. Hastings when he read your summary of

25   that you agreed that that was accurate, that you tried to

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 21 of 134

1  kiss LK on the mouth?

2  A.  I don't recall Dr. Hastings asking me or mentioning

3  that I kissed him on the mouth.

4  Q.  All right. You asked LK to sleep with you in the same

5  bed?

6  A.  Yes, I did.

7  Q.  When LK refused -- you were sad when he refused to

8  sleep in the same bed with you. Is that correct?

9  A.  I guess I could say that, yes.

10  Q.  All right. You told LK it was okay for boys to put

11  their ding dongs in each other's butt holes.

12  A.  I never said that.

13  Q.  You took LK shopping to try to convince him to sleep

14  in the same bed with you.

15  A.  Took him shopping?

16  Q.  Shopping, yes.

17  A.  Yes.

18  Q.  You also asked CK to sleep with you in the same bed?

19  A.  CK?

20  Q.  Yes. The boy's initials were CK. You asked him to

21  sleep in the same bed with you.

22  A.  There was just one and I believe it was CK that we

23  were talking about before.

24  Q.  All right. You gave CK what they call a wet Louie?

25  A.  Yes.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646   sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO  Document 62  Filed 01/22/18  Page 22 of 134

1    Q.    Remember that?

2    A.    Yes, I do.

3    Q.    And a wet Louie is where you put your tongue in the

4    boy's ear; is that correct?

5    A.    That's correct.

6    Q.    And you would scratch CK's back with your beard?

7    A.    Repeat that.

8    Q.    You had a beard at that time; is that correct?

9    A.    Oh, yes.

10   Q.    And you used your beard to scratch his back?

11   A.    Yes.

12   Q.    Isn't that correct?

13   A.    I believe so.

14   Q.    And on one occasion CK wanted to drive and you put him

15   on your lap; isn't that correct?

16   A.    I don't recall putting anybody on my lap.  I do recall

17   the boy asking if he could assist with the driving.  And I

18   do recall when we were stopped that he was on the side.

19   Perhaps he was sitting on my lap for a minute or two.  I

20   had to drive and would not allow him to continue.

21   **THE COURT:**  Were you molested as a young boy?

22   A.    No, Your Honor.

23   **THE COURT:**  You never were?

24   A.    No.

25   **THE COURT:**  Okay.

1  Q.  When CK was on your lap, you gained an erection; isn't
2  that correct?

3  A.  No.

4  Q.  Do you remember telling Dr. Hastings that?

5  A.  No, I do not.

6  Q.  That you got an erection?

7  A.  I did not tell him that.

8  Q.  Now you spent a number of months in jail while that
9  case was pending before it was ultimately dismissed; is
10 that correct?

11 A.  Yes.

12 Q.  Now the third conviction that you sustained was on
13 April 1, 1987, and that was after a jury trial on five
14 counts of sexual offense in the second degree and four
15 counts of sexual offense in the third degree.  Is that
16 correct?

17 A.  Yes.

18 Q.  And the victim in that offense was a 12 year old boy.

19 A.  Yes,

20 Q.  And this same victim was a boy that was one of the
21 nolle prossed cases earlier on; is that correct?

22 A.  Yes.

23 Q.  And that molestation occurred over a number of
24 weekends; isn't that correct?

25 A.  Yes.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 24 of 134

1    Q.    And you left a key in your mailbox so the boy could

2    get into your residence?

3    A.    Yes.

4    Q.    And the boy slept in the bed with you; isn't that

5    correct?

6    A.    Yes.

7    Q.    You fondled the boy's genitals?

8    A.    Yes.

9    **THE COURT:**  Have you had consensual adult sex with men?

10   A.    No.

11   **THE COURT:**  You have not?

12   A.    No.

13   **THE COURT:**  Okay.

14   Q.    With regard to that, you and this same boy had sex on

15   three other instances before; is that correct?

16   A.    Yes.

17   **THE COURT:**  So your entire sexual experience has been

18   directed at male pre-puberty children?

19   A.    Up to age 18.  From approximately 10 to 18 with a

20   primary -- my primary area was between 13 and 15.

21   **THE COURT:**  Okay.  And that's it?  Those are the only

22   partners or objects of your sexual expression?

23   A.    Yes.

24   Q.    Well, just as a point of clarification, in your second

25   conviction one of the boys was a nine year old; is that

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646     sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 25 of 134

1    right?

2    A.   That's right.  He asked my interest, my range of

3    interest.  The nine year old was brought along by the older

4    child.

5    Q.   But you still molested him though?

6    A.   Right.

7    Q.   The boy in the 1987 conviction, you paid that boy

8    money; isn't that correct?

9    A.   Not for sex I didn't.

10   Q.   You considered that boy a hustler?

11   A.   He was -- he was a street -- he was street savvy.  He

12   lived on the streets of Baltimore.  I don't know -- you

13   would have to give me the definition of what you might call

14   a hustler.

15   Q.   Well, you knew that boy would have sex with men for

16   money; isn't that correct?

17   A.   I knew he had done that before, yes.

18   Q.   Right.  And during the molestation you ejaculated the

19   boy manually; is that correct?

20   A.   Yes.

21   Q.   All right.  And you performed fellatio on the boy?

22   A.   Fellatio?

23   Q.   Yes.

24   A.   When he testified -- the reason I went to trial for

25   that was because that happened to be a second degree sex

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 26 of 134

1    offense, and I did not believe that I had performed

2    fellatio.  In the testimony he said that I put my lips on

3    his penis, which I interpreted it as kissing.  So I didn't

4    know whether that would be considered fellatio or not.  But

5    apparently the court considers that fellatio.

6    Q.   You were sentenced to 18 years; isn't that correct?

7    A.   Yes.

8    **THE COURT:**  This was in state court or federal court?

9    A.   State.

10   Q.   And, in fact, from your very first conviction there

11   was a probation violation, which two years was tacked on to

12   that.  Isn't that correct?

13   A.   I believe so.

14   Q.   All right.  So when you were released from prison in

15   July of 2000, you were 57 years old at the time; isn't that

16   correct?

17   A.   Yes.

18   Q.   All right.  You also met with a parole officer and you

19   were told you had to stay away from children.  You knew

20   that, right?

21   A.   I knew that, yes.

22   Q.   And despite knowing that you began -- you were at a

23   pool and you began associating with a boy who was either 11

24   or 12 years old, correct?

25   A.   When exactly are you talking about now?

1  Q.  After you were released from prison in July of 2000 --

2  A.  Yes.

3  Q.  All right?

4  A.  Yes.

5  Q.  You were 57 years old at the time, right?

6  A.  Right.

7  Q.  You were told by your parole officer you had to stay

8  away from children; you knew that?  You were not to

9  associate with children

10 A.  Right.

11 Q.  You knew that?

12 A.  Yes.

13 Q.  And during that time, while you were on parole and in

14 violation of that parole, you became acquainted with a boy

15 who was either 11 or 12 years old, right?

16 A.  Yes.

17 Q.  And I believe you met the boy at a swimming pool?

18 A.  Yes.

19 Q.  Okay.  And you met the boy's mother, right?

20 A.  Yes.

21 Q.  And the boy's mother was an alcoholic who subsisted on

22 public assistance; is that correct?

23 A.  Yes.

24 Q.  And once again, the boy was from a fatherless home; is

25 that correct?

1  A.   Yes.

2  Q.   You were sexually attracted to the boy?

3  A.   At that time I can't say that I was sexually

4  attracted.

5  Q.   All right.  Well, if you recall from your deposition

6  at page 87 you said you were sexually attracted to the boy?

7  A.   I guess I found some attraction there then.

8  Q.   All right.

9  A.   But I didn't perform any action that would be

10  considered sexual.  I had no sexual contact with him, so

11  that's what I meant by not having a sexual interest in him

12  or being sexually attracted.

13  Q.   Well, my question was were you sexually attracted to

14  the boy, and your answer was, yes; isn't that correct?

15  A.   Somewhat.

16  Q.   You purchased the boy items including lacrosse

17  equipment and shoes?

18  A.   Yes.

19  Q.   All right.  You took the boy to track meets?

20  A.   Yes.

21  Q.   You visited the boy in his home?

22  A.   Yes.

23  Q.   You entered the boy on a wrestling team?

24  A.   Yes.

25  Q.   You did things for the boy's mother.  Because she

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646     sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 29 of 134

1    didn't drive you brought her things, you drove her places?

2    A.    I helped the family out, yes.

3    Q.    And the boy's mother trusted you?

4    A.    Yes.

5    Q.    Now, within eight or nine months of that meeting or

6    association with the boy you became aware of the fact that

7    parole began questioning or local police officials began

8    questioning the boy about his relations with you; is that

9    correct?

10   A.    I think it was longer than eight months.  It was

11   closer to a year.

12   Q.    Well, do you recall at deposition page 86 saying that

13   your association with the boy lasted between eight and nine

14   months?

15   A.    Okay.  I thought it was a little longer than that.

16   Q.    Local officials, police officials, questioned the boy,

17   and the boy's mother at one point actually called you and

18   told you that the police had spoken to the boy; is that

19   correct?

20   A.    Yes.

21   Q.    And right around that same time about 2:00 a.m., the

22   police came to your door and knocked on your door, right?

23   A.    Yeah.

24   Q.    And you didn't answer the door?

25   A.    Correct.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 30 of 134

1   Q.   And you were on parole at the time, right?

2   A.   Yes.

3   Q.   And once they left you fled your apartment?  Isn't

4   that correct?

5   A.   Yes.

6   Q.   You never came back to the apartment?

7   A.   Right.

8   Q.   You had funds because when your mother passed away you

9   inherited about $70,000?

10  A.   Yes.

11  Q.   So you then went to an associate or a friend that you

12  knew who was a longshoreman and told him you would like to

13  leave the country, right?

14  A.   Yeah.

15  Q.   And that person put you in contact with a friend of

16  his in the Philippines?

17  A.   Yeah.

18  Q.   And you then traveled to the Philippines at that

19  point; is that correct?

20  A.   Yeah.

21  Q.   And stayed with that person for a couple of days

22  before you settled in a town about 50 miles outside of

23  Manila; is that correct?

24  A.   Yes.

25  Q.   Now you were 57 - 58 years old at that time?

Richard Schmidt Direct 32

1    A.    Probably 60 at that time.

2    Q.    Okay.  Probably about 60 at that time, right?  And

3    within four months of arriving in the Philippines you

4    sexually molested a boy; is that correct?

5    A.    Yes.

6    Q.    Once again, that boy was poor, right?

7    A.    Was what?

8    Q.    That boy was poor?

9    A.    Yes.

10   Q.    Came from a poor family.  You got the mother to trust

11   you, right, the boy's mother?

12   A.    Yes.

13   Q.    You were giving them things, some money; is that

14   correct?

15   A.    I supported the family, yes.

16   Q.    You supported the family, right.  And the authorities

17   in the Philippines were aware of your sexual molestation,

18   and you had charges on you; is that correct?

19   A.    And I did what?

20   Q.    You were charged in the Philippines; is that correct?

21   A.    Yes.

22   Q.    Thereafter you went to Cambodia?

23   A.    Yes.

24   Q.    And once you were in Cambodia once again you sexually

25   molested children; is that correct?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646     sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 32 of 134

1    A.    One.

2    Q.    Well, you still sexually molested a child; isn't that

3    correct?

4    A.    Yes.

5    Q.    And this despite the fact that you were -- you had a

6    charge in the Philippines.  You couldn't lay low; you went

7    to Cambodia; is that correct?

8    A.    Couldn't what?

9    Q.    You couldn't lay low.  You didn't just go to Cambodia

10   --

11   **THE COURT:**  You couldn't avoid sex.

12   **MR. JAMES:**  Yes, thank you, Your Honor.

13   Q.    You couldn't avoid behaving in sexual contact with

14   this boy while you were in Cambodia?

15   A.    Well, there's a story involved with that that I think

16   I've related it to everybody, including you, during the

17   deposition, that I was -- I had to leave the Philippines in

18   order to renew my visa, and I had to do that every 30 days.

19   When I got to Cambodia and was in the process of renting an

20   apartment, there were children in the area that came into

21   the home and played video games and watched television.  I

22   wasn't involved with them at all.  However, the ICE agent

23   through what they call government -- NGO -- watch for

24   people that are walking around that are in the company of

25   local children.  And at that time the ICE agent along with

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 33 of 134

1    the NGO arrived at my apartment along with the Cambodian

2    police and came in and wanted to do a search of the

3    apartment to see if there were any children there. There

4    were none there. However, a lock was put on my door and so

5    I was going to be arrested anyway while they looked in the

6    neighborhood for any boys that were in the neighborhood

7    that may have been involved with me. The next day I was

8    released from custody as the boys in the neighborhood

9    denied that there was any sexual activity at all, and I

10    tried to go back to the apartment and the apartment was

11    locked, and I was told that the ICE agent was still going

12    to investigate. So at that time I met -- not knowing what

13    to do, loose on the street, not able to get into my

14    apartment, I did meet a boy who told me he was 15, on the

15    street, 15 years of age, and I did become involved with him

16    sexually, but we were -- he was what I would call a street

17    hustler also. And at that time we did go to a motel room,

18    and I was in the process of teaching him English. They

19    found paper, pencil and all the work that we were doing

20    together. We were there for about 45 minutes. Then the

21    police came busting in. They found us not naked, not nude,

22    not doing any -- having any sex. They found no evidence of

23    it. However the intention for me at that time was to

24    involve in sexual activity with him. And there was minor

25    touching and fondling, but we did not actually have what I

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 34 of 134

1  would call a sexual, complete sexual episode.

2  Q.   All right.  Well, several things.  First, when you

3  arrived in Cambodia after facing charges in the

4  Philippines, what were you doing having boys coming into

5  your place in Cambodia at all?

6  A.   Well, because that's Cambodia.  That's a whole

7  different situation there.  First off -- and I need to say

8  that I had a rationale at the time that I could become

9  involved with anybody provided I didn't perform an illegal

10 act.  And I enjoy teaching, I enjoy being around children,

11 and I've always enjoyed sponsoring people and helping

12 people.  So my rationale at the time was that I could still

13 be around them.  And this wasn't the United States where I

14 was denied, you know, on a parole violation of any sort.  I

15 was under the impression that I could be around children as

16 long as I didn't commit a crime.

17 Q.   All right.  So after you were arrested in Cambodia you

18 were deported back to the United States; is that correct?

19 A.   Correct.

20 Q.   And you entered two guilty pleas, one to -- there was

21 a ten count indictment, and you entered guilty pleas to

22 Count 7 and Count 10, correct?

23 A.   Correct.

24 Q.   And in Count 10 that was being a United States citizen

25 engaging in foreign commerce to have illicit sex; isn't

1   that correct?

2   A.    The charge -- there were two charges, right?  That's

3   what you were saying?

4   Q.    That's correct.

5   A.    One charge was dismissed and overturned.  The one then

6   that is left is 2322(c), which states travel and foreign

7   commerce and having sexual contact with somebody under the

8   age of 18 once you arrive in that country.

9   Q.    And you pled guilty to that?

10  A.    Yes.

11  **MR. JAMES:**  I'm finishing up, Your Honor, if I can have

12  just one moment?

13  **THE COURT:**  Take your time.

14  Q.    You've stated in your deposition at page 105 that the

15  sexual attraction that you had with males, with boys, is

16  something that is not going to go away.  It's going to be

17  completely with you for the rest of your life.  That's

18  true, isn't it?

19  A.    To some extent it's probably something that does not

20  just go away.

21  **MR. JAMES:**  I have no further questions, Your Honor.

22  **THE COURT:**  How old were you when you first realized you

23  were only attracted to young boys?

24  A.    Probably at 16 - 17, something like that.  I was

25  attracted -- I guess maybe it was a little bit later than

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 36 of 134

1   that, probably at 18 or 19.

2   **THE COURT:**  Before you went to college, or were you still

3   in high school?

4   A.   Right at the end of high school.  Generally any sexual

5   activity involved people closer to my own age, maybe a year

6   younger.

7   **THE COURT:**  But with males?

8   A.   But with males, yes.

9   **THE COURT:**  And there was sexual activity when you were 17

10  or thereabouts with males?

11  A.   Yes.  Yes.

12  **THE COURT:**  And now you're 75?

13  A.   Yes, sir.

14  **THE COURT:**  So for almost 60 years your entire life has

15  been channeled into this behavior?

16  A.   Yes, it has, Your Honor.

17  **THE COURT:**  Okay.  Do you have any questions.

18  **MR. TARLTON:**  Yes, Your Honor, I do.

19                        CROSS-EXAMINATION

20  **BY MR. TARLTON:**

21  Q.   Mr. Schmidt, how long have you been incarcerated?

22  A.   For this past incarceration?

23  Q.   Yeah, in federal prison.

24  A.   It's been, I think, 14 years.

25  Q.   You've told us a little bit about a rationale you had

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 37 of 134

1    at the time that you were committing your crimes.  Well,

2    what do you mean by that, at the time?

3    A.    Well, the rationale I always used was that I thought

4    the victims were willing.  Or I thought that I could be as

5    a teacher or as a mentor to them and be of some benefit in

6    their life.  So I realize that rationale is wrong now, but

7    still to me if the victim was willing I was also willing.

8    Q.    What do you mean by wrong, specifically?

9    A.    Well, what I mean by that is over the years I've

10   realized and recognized the detrimental mental effects that

11   someone could suffer as a result of -- of having sexual

12   contact when they had not reached the age of 18.  That it

13   could be a suffering that it could cause damage.

14   Q.    When did you start developing this realization?

15   A.    Well, it's been over the years.  Actually I felt it

16   when I was released the first time from prison after doing

17   the -- I think I did 10 years on the 18 year charge.  I

18   realized it when I got out, and I used that same rationale

19   with the young boy that I did meet when I got out, the 12

20   year old.  And during that period of time I guess I knew it

21   for I would say in about a year before I left for the

22   Philippines, and I used that same rationale, as long as I

23   didn't do anything sexually, everything was okay.

24   Q.    Let's talk a little bit about your history while in

25   federal prison.  What kind of classes or work, jobs and

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 38 of 134

1   things like that have you done while in prison?

2   A.   Well, I've got a lot of programming hours.  I attended

3   fiber optic school.  I attended and got certificates in

4   Microsoft computing, and I taught Microsoft office classes

5   and GED teacher.  There are many classes I've taken.  I've

6   spent the whole time -- I think I have close to 5,000 hours

7   of programming.

8   Q.   And what about infractions or accusations that you've

9   broken the rules, anything like that?

10  A.   I've never gotten any infractions since I've been

11  incarcerated in any incarceration.

12  Q.   Of any type?

13  A.   None, no infractions at all.

14  Q.   Have you seen inmates that have -- that are sex

15  offenders breaking rules such as collecting images of

16  minors or engaging in sex acts?

17  A.   I've seen a lot of that, yes.

18  Q.   Substance abuse, drugs, alcohol?

19  A.   Well, in my time in the commitment unit I've seen a

20  lot of collecting of pictures, a lot of sex between

21  inmates, a lot of -- I've heard a lot of telephone calls

22  and email problems.  And before that I've seen a lot of

23  drug use, a lot of alcohol use, yes.

24  Q.   Why haven't you engaged in any of that?

25  A.   Well, I never engaged -- I was never interested in

1    getting into any kind of activity like that at all.  I only
2    wanted to serve my time and do everything that I was
3    supposed to do.  I had no interest -- I'm not a drug user.
4    I don't use alcohol.  I'm not interested in pornography.
5    That's all something I'm not interested in.
6    Q.   Now, back in 2015 just before Maryland initially
7    vacated your convictions were you working on any kind of
8    release plan or even right after?
9    A.   Recent?
10   Q.   Since 2015.
11   A.   Since 2016.  What I'm trying to do, I have full Social
12   Security benefits and I've been trying to stay in touch
13   with the VA.  I've already applied for old age benefits,
14   which I'm eligible for, plus compensation for damages that
15   I incurred while I was in the service, which should give me
16   enough money to live on.
17   Q.   Have you reviewed a letter from the probation office
18   discussing the terms of your lifetime supervised release?
19   A.   Yes.
20   Q.   Do you understand what kind of conditions you would be
21   under if you were ever released?
22   A.   Yes.
23   Q.   What's your understanding of those conditions?
24   A.   Well, one is I remember seeing that I would have to
25   wear an ankle bracelet and I would have to attend therapy,

1  which I would agree to.  The other conditions, I think they

2  said they would monitor me very closely.  I'm not sure of

3  everything that was on that.  Of course I'm not to have any

4  contact with anybody under the age of 18.

5  Q.   Why should this Court to believe that you wouldn't

6  just leave and go back to the Third World or developing

7  world?

8  A.   Well, at 75 years of age I can't find work to sustain

9  me at all.  Not only that but they have ordered that I no

10  longer have a passport, so I wouldn't be able to leave the

11  country.  And there's no way I could find jobs overseas

12  anywhere.

13  **THE COURT:**  Are you taking any medicines?

14  A.   I'm taking some medicine, yes.

15  **THE COURT:**  What are they for?

16  A.   I take a blood pressure medication.  I take a baby

17  aspirin every day and I take an aspirin, not aspirin, a

18  medication called Tamsulosin for I think it's a prostate

19  issue.

20  **THE COURT:**  Does any of that affect your sexual drive?

21  A.   Well -- yes.  The -- well, those medications don't no.

22  **THE COURT:**  They don't?

23  A.   No.  I've been diagnosed with an enlarged prostate and

24  I've been on medical care for urinary problems, and I don't

25  think any of that affects anything else.

1    **THE COURT:**  Okay.

2    Q.   How would you describe your sexual interests and

3    fantasies, if any, at this point in your life?  Right now.

4    A.   I have no -- no interest -- no intent, no interest in

5    anything like that at all.  I've never had really fantasies

6    anyway.  My libido is probably close to zero.  I have no

7    desire to engage in any inappropriate activities.

8    Q.   Have there been visible changes with your sexual

9    desire over the last -- since you were 60 years old until

10   today?

11   A.   Well, I know for the last probably 15 years my libido

12   has been going down pretty steadily.  So in the last --

13   since I've been incarcerated not only has my libido been

14   going down but I think my prostate has caused some problems

15   to where I'm not even able to get an erection or sustain an

16   erection for any amount of time at all.

17   Q.   I know there were legal issues surrounding why you

18   wouldn't seek out sex offender treatment in prison.  Did

19   you ever have an interest in that.  I think the reports

20   show that you declined wanting to participate in sex

21   offender treatment while you were in federal prison.  Did

22   you ever seek it out in any way at any time?

23   A.   Well, yes, I did.  When I first came into the system,

24   in normal interviews I was asked if I wanted to

25   participate.  And I think the only thing I was told about

1    was a program at Devens, and I said I wasn't interested at
2    the time, that I wanted more information. And the doctor
3    that interviewed me said, fine, she would pass on more
4    information. Well, I didn't hear anything more at all, but
5    when I got to Fort Dix in 2010 I did request to come to
6    Butner, and I was denied by my caseworker or counselor at
7    the time. So I did ask to come to Butner, but I didn't
8    know anything about what the programs entailed or anything
9    like that.
10   Q.   And then finally if you are offered supervised
11   lifetime -- or lifetime supervised release, what's your
12   plan for what you're going to do for the rest of your
13   years?
14   A.   Well, my plan I guess will be to retire just like any
15   other retired person would do. I want to have a quiet
16   finish to my life. I'm interested in reading, having a
17   garden and I did do work before for NIH, and it may be
18   possible I could do some part-time work.
19   Q.   What's NIH?
20   A.   National Institute of Health. I did studies for them,
21   and I enjoyed that. And that would be available even at my
22   age. Like I said, I know I can't find work anywhere, but I
23   could possibly do some part-time work.
24   Q.   Thank you.
25   **MR. TARLTON:** No further questions, Your Honor.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 43 of 134

1    **THE COURT:**  Anything?  Go ahead.

2                    REDIRECT EXAMINATION

3    **BY MR. JAMES:**

4    Q.   We'll just pick up on the last statement so it's

5    clear.  When you said you did work at NIH, you're talking

6    about volunteering for studies?

7    A.   Right.

8    Q.   You're not like a professor or doing any sort of

9    scholarship type work?

10   A.   No, I do studies with them.  And you can do as many as

11   you want.

12   Q.   So you volunteer for studies?

13   A.   Right.

14   Q.   That's what you're talking about.  When you say that

15   your libido is down and you cannot get an erection, you

16   realize the difference between sexual functioning, being

17   able to get an erection and sexual desire, right?

18   A.   Yes.

19   Q.   And you realize that there are medications for, such

20   as Cialis or Viagra for men who have a sexual desire and

21   want to gain an erection.  Is that correct?

22   A.   I've heard of that, yes.

23   Q.   You realize that?

24   A.   Yes.

25   Q.   So when you're saying in reference to questions by Mr.

1    Tarlton that you have no interest, your libido is zero,

2    isn't it a fair statement that when you were released in

3    July of 2000 if you were asked at that time you would have

4    said the same thing you're saying right now, that you had

5    no interest and low libido; is that correct?

6    A.    It was low at that time, yeah.

7    Q.    And that's what you would say?

8    A.    Yeah.

9    Q.    Nos, in fact, after that release, and we went through

10   them and I won't belabor the Court again by going through

11   all them, after your release from prison in July of 2000

12   you went on to sexually molest boys in the Philippines and

13   in Cambodia?

14   A.    Yes.

15   Q.    When Mr. Tarlton was going through with you the

16   supervised lifetime provisions and conditions you made

17   reference to an ankle monitor or ankle bracelet.

18   A.    Yeah.

19   Q.    Now, none of those conditions would stop you from

20   talking to a boy, meeting a boy, meeting a boy's family,

21   gaining that boy's confidence and then engaging in the

22   sexual molestation acts of rubbing yourself against the boy

23   or masturbating the boy.  None of those conditions would

24   have stopped that; is that correct?

25   A.    None of that I have any interest in any longer.  And I

1   didn't -- when I was released from prison in 2000 I knew
2   that I could not commit another crime.
3   Q.   But you did commit another crime?
4   A.   But it was in another country.  I went and you say
5   eight months.  I know I was with a boy for a year only to
6   enjoy the company of the boy, not to engage in any sexual
7   activity.  The desire and the intent has been lowered
8   considerably.  Whether it's something that would stay with
9   someone their entire life of not I guess the doctors would
10  be best to answer that.  I just know that my interest and
11  intent are not to engage in any kind of sexual activity
12  with anybody under the age of 18.  And my lack of libido,
13  my overall situation right now has convinced me -- I'm
14  convinced that at my age now with the lack of libido that I
15  have no intent or interest in performing any kind of
16  illegal sexual act.  I only want to finish my life quietly
17  and retire as a normal person.
18  Q.   When Mr. Tarlton went through with you questions
19  relating to what you had seen other inmates do, as you
20  pointed out in your examination you never engaged in
21  collecting pictures of children; isn't that correct?
22  A.   That's correct.
23  Q.   You have all during the times you have been
24  incarcerated, whether it was your 18 years state term, your
25  current federal term or the smaller two year term in your

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 46 of 134

1    earlier incarceration history, you've never acted out as an

2    inmate?

3    A.   Never acted?

4    Q.   You've never acted out as an inmate?

5    A.   No.

6    Q.   You've never presented any problems in any

7    institution; is that correct?

8    A.   That's correct.

9    Q.   And despite that, when you were released, each time

10   you've been released from imprisonment, you engage in acts

11   of sexual molestation with boys.  Isn't that correct?

12   A.   Well, that's correct.

13   **MR. JAMES:**  No further questions, Your Honor.

14   **THE COURT:**  All right.  Thank you.  You can step down.

15        Do you have any other witnesses?

16   **MR. JAMES:**  Yes, Your Honor.  At this time we call Dr.

17   Watkins.  Mr. Renfer will be examining.

18        **DR. ROBIN WATKINS, GOVERNMENT'S WITNESS, SWORN**

19                   DIRECT EXAMINATION

20   **BY MR. RENFER:**

21   Q.   Good morning, ma'am.

22   A.   Good morning.

23   Q.   Where are you currently employed?

24   A.   I am currently employed at the Metropolitan

25   Correctional Center in Chicago, Illinois.

1    Q.   And what are some of your duties and responsibilities?

2    A.   I am a forensic psychologist there.  I conduct court

3    ordered psychological evaluations involving competency to

4    stand trial, competency to represent oneself, competency to

5    be sentenced, criminal responsibility and general

6    mitigating factors, presentence reports.  I also do

7    supervision of students there.  Crisis intervention.

8    Manage two units in the prison setting in terms of their

9    clinical needs.

10   Q.   And at some point were you working at BOP at Butner?

11   A.   Yes, I was.

12   Q.   And at the time there what were your duties and

13   responsibilities?

14   A.   My title there was sex offender forensic psychologist.

15   The duties were largely the same as what they are in

16   Chicago, plus the addition of about 40 to 50 percent of my

17   caseload was this type of evaluation for sexual

18   dangerousness under the Adam Walsh Act.

19   Q.   So I take it then that you have evaluated individuals

20   in the past to determine whether they are sexually

21   dangerous under the Adam Walsh Act?

22   A.   I have.

23   Q.   Approximately how many times?

24   A.   Approximately 15 I would say, 15 to 18.

25   Q.   As part of your duties and responsibilities did you

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 48 of 134

1    have an occasion to evaluate Richard Schmidt to determine
2    whether he is sexually dangerous?
3    A.   I did.
4    Q.   Under the Adam Walsh Act?
5    A.   I did.
6    Q.   What are the three elements or criteria that you
7    evaluate to determine whether someone is sexually
8    dangerous?
9    A.   Whether the individual has committed an act or
10   attempted act of child molestation or sexual violence would
11   be the first.  Whether there is the presence of a serious
12   mental illness, abnormality or disorder would be the
13   second.  And then the third would be as a result of that
14   illness, abnormality or disorder would the individual have
15   serious difficulty refraining from future child molestation
16   or sexual violence.
17   Q.   And after evaluating Mr. Schmidt did you reach an
18   opinion as to those three criteria?
19   A.   I did.
20   Q.   And did you draft a report that reflects your
21   opinions?
22   A.   I did.
23   Q.   Now in an effort to evaluate Mr. Schmidt did you try
24   to interview him?
25   A.   I did.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646     sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 49 of 134

1  Q.  And what was his response to your request for you to

2  interview him?

3  A.  He declined.

4  Q.  Well, with regard to the first criteria, did you have

5  an opinion as to whether he had committed acts of sexual

6  violent conduct or child molestation?

7  A.  Yes, I did.

8  Q.  And what was that opinion?

9  A.  Affirmative that he had committed such acts.  He had

10  been convicted for four contact sexual offenses and had

11  been charged with a fifth as well.  All the victims were

12  males between the ages of eight and 13, which would qualify

13  that as child molestation.

14  Q.  With regard to the second criteria, whether Mr.

15  Schmidt suffers from a serious mental illness or disorder,

16  did you have an opinion about that?

17  A.  Yes, I did.

18  Q.  And what was that opinion?

19  A.  Again, my opinion was in the affirmative.  I diagnosed

20  him, based on a record review, with pedophilic disorder,

21  exclusive type, sexually attracted to males.

22  Q.  Regarding the third criteria, did you reach an opinion

23  as to whether he would have serious -- as a result of a

24  serious mental disorder he would have serious difficulty in

25  refraining from engaging in future acts of sexual violent

1    conduct or child molestation if released?

2    A.   Yes, I did.

3    Q.   And what was that opinion?

4    A.   Again, that finding was also in the affirmative.  My

5    opinion was that because of the pedophilic disorder,

6    exclusive type, he would have serious difficulty

7    refraining.

8    Q.   And as part of your evaluation did you consider any

9    actuarial assessment?

10   A.   Yes, I did.

11   Q.   Specifically which one?

12   A.   The Static-99R.

13   Q.   And what was the score Mr. Schmidt received for the

14   Static-99R?

15   A.   At the time I scored it, I had limited information.  I

16   was the first one to evaluate him.  He did not participate

17   in an interview, so I was uncertain about one of the

18   factors, so I scored it two ways just in an abundance of

19   caution to account for the potential for that having to be

20   scored either way depending on more information that would

21   be obtained.  That item involved whether he had ever lived

22   with someone with whom he was in a significant

23   relationship.  Now I know that he has not, and the

24   criterion is that that cohabitation occur for a period of

25   at least two years.  At the time I scored that as a zero or

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 51 of 134

1    one, so the Static total score would have been three or

2    four.

3    Q.   And based on all the information you received up to

4    today's date, how would you score that Static-99R score?

5    A.   So it would be the latter score of four.

6    Q.   Four?

7    A.   Yes.

8    Q.   And what range does that put him in?

9    A.   The quality descriptor would be the moderate to high

10   range, based on that score.

11   Q.   Could you describe to the Court exactly what the

12   moderate to high range means in practical terms?

13   A.   There's not a very defined explanation of what those

14   qualitative descriptors mean.  However, there are some

15   numbers, some recidivism rates, over a five and ten year

16   range that are more, I think, descriptive of where his

17   score would have fit in.  So comparing him to a routine

18   sample, his five year recidivism rate would be 11, 11

19   percent.  Comparing him to a high risk high needs sample,

20   his five year would be 17.3 percent and his ten year would

21   be 27.3 percent.

22   Q.   And as part of your opinion did you consider any

23   empirically supported risk factors, other than those

24   dynamic risk factors?

25   A.   Yes, I did.

1    Q.   And the first one regarding sexual preoccupation,

2    what, if any, findings did you make with regard to Mr.

3    Schmidt's sexual preoccupation?

4    A.   I concluded that there was significant evidence of

5    sexual preoccupation based on his longstanding repetitive

6    nature of offending, his repeated encounters with young

7    boys in various contexts, both prior to now I know from

8    reviewing other records and other reports, prior to his

9    detection for the offenses I knew about at the time.  And

10   also while under supervision and while on parole for the

11   offenses that he had been convicted of.

12   Q.   And how about the deviant sexual interest?  Can you

13   state whether or not you found that applied to Mr. Schmidt?

14   A.   Yes, I did.  That factor refers to sexual preference

15   for prepubescent or pubescent children, typically defined

16   as females age zero to 12 and males age zero to 13.  His

17   victim pool fell within that range.  And there are other

18   facets that could qualify as deviant sexual interests, but

19   that's the one that I found applied to him.  And that was

20   clearly present just based on the evidence from his

21   repeated victim type.

22   Q.   And how about offense-supportive attitude?

23   A.   At that time because he had not participated in the

24   evaluation with me, I had not had the opportunity to

25   interview him, I just indicated that the presence or

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 53 of 134

1    absence of that risk factor was unknown.  However, in

2    reviewing the reports I saw that there was further evidence

3    to support the potential presence of that risk factor.  In

4    listening to Mr. Schmidt's testimony, I believe I saw even

5    greater evidence of the presence of that risk factor.

6    Q.   And that would apply to him?

7    A.   Yes.

8    Q.   And how about the emotional congruence with children?

9    A.   Yes.  Again, I think there was evidence of that at the

10   time of my evaluation and even more conclusive evidence now

11   that I have reviewed the reports of others who have

12   interviewed him, specifically about that factor.  I believe

13   he either testified in his deposition or maybe reported to

14   one of the evaluators that he did feel more comfortable

15   with children emotionally.  It sounds like his intent in

16   many of his sexual relationships was not so much driven by

17   sex but sort of an emotional relationship with the boys

18   with whom he was spending time.

19   Q.   And with regard to the dynamic risk factor lack of

20   emotionally intimate relationships with adults, did you

21   find that applied to Mr. Schmidt?

22   A.   Yes, I did.  I mean I just said there is no evidence

23   of emotionally intimate adult relationships in the

24   available information at the time that I conducted the

25   evaluation.  Again, having reviewed additional records and

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 54 of 134

1    his own statements, it's clear that that applies.

2    Q.   How about lifestyle impulsiveness?

3    A.   That factor was difficult for me to assess, again,

4    because he did not participate in the interview.  I still

5    don't feel like I have a great sense of what his day to day

6    functioning was.  There are certainly indications that he

7    was impulsive in leaving the country when he was alerted

8    that there was potential for him to get a parole violation.

9    But I don't know that there is clear evidence at this time

10   for me to say that that's present.

11   Q.   And how about the resistance to rules and supervision?

12   A.   Yes, that factor was present.  That was clearly

13   inferred from the information that I was able to review in

14   the records and his behavior over the various terms of

15   supervision that he has had.  He's had I don't believe any

16   successful terms of supervision in which he has completely

17   abided by the rules and not had a violation at some point.

18   Q.   At actually at one point he actually fled the United

19   States jurisdiction to avoid the repercussions of violating

20   parole, correct?

21   A.   Correct.

22   Q.   Now with regard to -- as part of your opinion did you

23   consider any what's called protective factors?

24   A.   Yes, I did.

25   Q.   And the first one, considering age, do you consider

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 55 of 134

1     Mr. Schmidt's age to be a protective factor in this case?

2     A.    In this case I don't believe that that protective

3     factor applies so much to Mr. Schmidt?

4     Q.    Why not?

5     A.    Typically you would expect to see someone's sexual

6     offending behavior, the trajectory of that behavior to

7     decrease with age, maybe starting in one's 40s.  And

8     actually that's around the time that Mr. Schmidt was first

9     detected and received his first sexual offense.  Now

10    certainly he has since admitted to previous sexual offenses

11    that dated much earlier than that, but it does appear there

12    was several offending behaviors in a row in his 40s for

13    which he was apprehended.  Once somebody hits the age of

14    60, you know typically that's sort of a benchmark of when

15    you might apply this protective factor, but Mr. Schmidt has

16    shown that he actually absconded from supervision to go to

17    not one but two countries with sex trading problems, I

18    guess I would say, and committed further sexual offenses in

19    those countries at the age of 61, I believe.  So in his

20    case, you know, his offending has continued well beyond

21    when one would expect to see that trajectory start to taper

22    off with age.

23    Q.    And other than possibly his self-serving statements

24    made to experts, did you see any indication in the record,

25    in any of the records or documents or his testimony here

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 56 of 134

1    today which led you to believe that his sex drive has

2    actually decreased with his age?

3    A.    I don't see anything objective.  What I would say

4    about that is even if he does have difficulty with getting

5    an erection as he said, that is somewhat relevant but

6    probably not entirely relevant because the nature of his

7    offending behavior did not require an erection in the first

8    place.

9    Q.    Could you elaborate on that, please?

10   A.    Yes.  Most of his offenses involves touching,

11   fondling, the tongue in the ear of one of the victims.

12   There were some cases where he was alleged to have had an

13   erection during the offending, but in the records I believe

14   it indicated that he typically would masturbate afterwards

15   to the memories of the offending.  To commit the offenses

16   himself in the moment he used his hands for the most part.

17   Q.    And I believe he indicated at one point he kissed a

18   boy's penis as well?

19   A.    Correct.

20   Q.    And how about the protective factor of time spent in

21   the community without offending, did you find or determine

22   whether that applies to Mr. Schmidt's particular case?

23   A.    Yes, I did not find that that applied.  In completing

24   a time line of his offending and his time in and out of the

25   community, it appeared that the little time he did have in

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 57 of 134

1   the community after he was first apprehended he violated

2   his terms of supervision, obtained new victims, committed

3   new offenses, so he did not have a significant period of

4   time in the community without offending.

5   Q.   And as part of your opinion did you consider the

6   Bureau of Prisons guidelines for commitment of sexually

7   dangerous individuals?

8   A.   Yes, I did.

9   Q.   And I guess one of those guidelines is a person

10  repeating contact with victims.  What, if any, opinion did

11  you have as to whether that applied in Mr. Schmidt's

12  particular case?

13  A.   I found that that did apply.  He had a total of ten

14  known victims at the time that I did the record review and

15  completed the evaluation.  Now based on his admissions to

16  other evaluators it seems that that number has gone up

17  pretty significantly.

18  Q.   There were victims from the time he was 18 until the

19  time he was incarcerated?

20  A.   Yes.

21  Q.   And what about the denial or inability to appreciate

22  the wrongfulness of his actions?

23  A.   Yes.  At the time there was little information in the

24  records, you know, to indicate whether or not he did

25  appreciate that.  There is mixed evidence I believe in the

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646     sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 58 of 134

1    other experts' evaluations and in his deposition and his

2    testimony today.  He does state that sexual abuse can have

3    a detrimental effect/impact on victims.  I didn't hear him

4    elaborate too much on what that means, so I can't say with

5    certainty what his attitudes are regarding that.  He

6    certainly doesn't deny his offending in general.  He seems

7    to have acknowledged that he has committed numerous

8    offenses.  But in terms of his appreciation of the impact

9    on the victims and the wrongfulness, I think that that's

10   unclear to me at this time.

11   Q.   And I believe you testified previously about the

12   actuarial assessment, correct?

13   A.   Yes, I did.

14   Q.   And what about his inability to control conduct such

15   as offending while on supervision?

16   A.   Certainly he has shown that he has repeatedly offended

17   while on supervision and violated the terms of parole and

18   supervised release in order to do so.

19   Q.   In fact, would it be a fair statement that every time

20   he has had a case pending or that he has been on some type

21   of parole or supervision, he has continued to reoffend even

22   though he has had a case pending, he has been awaiting

23   sentencing or his actions were being monitored?  Would that

24   be a fair statement?

25   A.   Yes, I think it would.

1    Q.   And what about the factor of, the BOP factor of

2    completion of sex offender treatment?  Did you find whether

3    that would apply to Mr. Schmidt's particular case?

4    A.   I found that he did not successfully complete

5    treatment.  He did participate in one program but was

6    terminated from the program for inappropriate actions.  He

7    declined participation in sex offender treatment while in

8    the BOP.  He mentioned during his own testimony that he

9    requested to go to Butner, and I believe he was saying that

10   in the context of he was asking to go to a place where

11   there was a treatment program.  And I just want to clarify,

12   having worked at Butner, there is no sex offender treatment

13   program there for regular inmates serving a sentence.

14   That's not a place that he could have received sex

15   treatment even if his request had been approved.  There is

16   one treatment program there, but that is in the context of

17   the commitment and treatment program for individuals who

18   are civilly committed sex offenders or individuals who have

19   pending cases like Mr. Schmidt.

20   Q.   And with regard to the participation in the sex

21   offender treatment that he was actually kicked out of,

22   that's in reference to back in the '80s with the Johns

23   Hopkins treatment, correct?

24   A.   Correct.

25   Q.   And you heard him testify about lifetime supervision,

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 60 of 134

1   correct?

2   A.   Yes.

3   Q.   Could you explain to the Court why -- or do you feel

4   that lifetime supervision would work in Mr. Schmidt's

5   particular case?

6   A.   I do not believe that really there is any term of

7   supervision that would be sufficient to ensure that Mr.

8   Schmidt does not reoffend.

9   Q.   Why is that?

10  A.   Because he has had numerous terms of supervision

11  placed on him in the past and has violated all of them.  He

12  ia correct that it would be much more difficult for him to

13  flee the country now that he isn't allowed to have a

14  passport.  But he has also shown that his method of

15  selecting victims and grooming them, so to speak and

16  getting them to comply with offending can be done in a way

17  that appears maybe innocent at the time.  Like he was

18  developing a relationship trying to help others he said,

19  trying to support the families, gaining trust.  That's a

20  difficult thing to monitor through a term of supervision.

21  Yes, he is ordered not to have contact with minors but he

22  has been ordered to not have contact with minors several

23  times in the past and has not abided by that.

24  Q.   Other experts in the case, in this case, have actually

25  found that age is a protective factor.  Could you explain

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646     sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 61 of 134

1    to the Court why -- or do you agree with those experts that

2    age is a protective factor in the case?

3    A.   No, I do not believe in his case that that protective

4    factor would apply.

5    Q.   And I think a couple of the experts in this case have

6    also found significance in the fact that Mr. Schmidt has

7    been incident free in prison for the past 13 or so years.

8    Do you find that to be a relevant factor in Mr. Schmidt's

9    particular case?

10   A.   Not so much in his case.

11   Q.   Why not?

12   A.   Because -- first of all he doesn't have access to his

13   preferred victim pool.  There are no boys between the ages

14   of nine or ten and 18 in a federal prison setting.  By

15   definition they are not inmates there and there are no

16   staff there of that age.  So he doesn't have interpersonal

17   access to that.  Now the type of acting out that you would

18   normally see in prison that might be indicative of trouble

19   controlling one's sexual action is typically something

20   along the lines of collecting images, even watching TV

21   programs with children, cutting out magazine pictures of

22   kids in swimsuits, things along those lines.  But that

23   tends to be observed in individuals who are more visually

24   stimulated, and Mr. Schmidt in his case has stated that

25   he's never had that interest.  He's never been interested

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646     sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 62 of 134

1    in child pornography.  His interest appears to be more

2    rooted in the emotional connection with children, which

3    then also involves numerous boundary violations and sexual

4    offending against those victims.  So it all seems

5    intertwined together with the emotional component of it,

6    which is much more difficult to tease out and reverse I

7    think in the future when his entire interpersonal style of

8    interacting has centered around that type of relationship

9    with young children where he could be a mentor or teacher.

10    **MR. RENFER:**  No further questions, Your Honor.

11    **THE COURT:**  Do you have anything you want to ask her?

12    **MR. TARLTON:**  Just briefly, Your Honor.

13                          CROSS-EXAMINATION

14    **BY MR. TARLTON:**

15    Q.   Dr. Watkins, when you sought to interview Richard

16    Schmidt that was several months or a month or so after his

17    convictions had been thrown out but before he had been

18    certified for commitment, correct?

19    A.   That's correct.

20    Q.   They never asked you to interview him after April of

21    2016 after they certified him in court?

22    A.   I'm sorry, can you repeat that?

23    Q.   You were never asked to interview Mr. Schmidt after he

24    was certified in court?

25    A.   No.  No, I was not asked to repeat the evaluation or

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 63 of 134

1    interview him.

2    **MR. TARLTON:**  No further questions.

3    **THE COURT:**  All right.  Thank you.  You can step down.

4    A.   Thank you.

5    **MR. JAMES:**  At this time the United States calls Dr. Gary

6    Zinik.

7    **THE COURT:**  Who?

8    **MR. JAMES:**  Dr. Gary Zinik.

9         **DR. GARY ZINIK, GOVERNMENT'S WITNESS, SWORN**

10                   DIRECT EXAMINATION

11   **BY MR. JAMES:**

12   A.   Good morning, Your Honor.

13   **THE COURT:**  Good morning.  What's your name?

14   A.   Zinik, Gary Zinik.

15   **THE COURT:**  Z-I --

16   A.   Z-I-N-I-K.

17   Q.   All right.  Dr. Zinik, you've testified in a number of

18   4248 matters; isn't that correct?

19   A.   Yes.

20   Q.   In fact, you've testified before Judge Boyle in the

21   past; isn't that correct?

22   A.   Yes.

23   Q.   I believe in the Caporale case?

24   A.   And others, yes.

25   Q.   All right.  You have testified before as an expert

1   witness in all these cases?

2   A.   Yes.

3   Q.   You have been in this field as a forensic

4   psychologist, an expert forensic psychologist in the area

5   of sexual predator evaluations, not only in federal courts

6   but state courts, California and elsewhere; is that

7   correct?

8   A.   Yes.

9   Q.   How long have you been doing this; how many years now?

10  A.   About 35 years.

11  Q.   Now with regard to the Richard Schmidt case, you found

12  prong one of the Adam Walsh Act; is that correct?

13  A.   Yes.

14  Q.   And, for the record, that is in your report pages 2 to

15  8 or Bates 1684 to 1690, which is Exhibit Number 7 in your

16  notebook.  Isn't that correct?

17  A.   Yes.

18  Q.   All right.  And that's based on his convictions and

19  his admissions and the undetected offenses; isn't that also

20  correct?

21  A.   Yes.

22  Q.   And with regard to prong 2, you found that Mr. Schmidt

23  does suffer from a serious mental illness, abnormality or

24  disorder; is that correct?

25  A.   Yes.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 65 of 134

1  Q.  And that's in fact pedophilic disorder?

2  A.  Yes.

3  Q.  Sexually attracted to males?

4  A.  Yes.

5  Q.  Exclusive type?

6  A.  Correct.

7  Q.  All right.  You have a specifier exclusive type.

8  First of all, what does that mean?

9  A.  That means that Mr. Schmidt has never had sexual

10  attractions or arousal to adult partners.  I think we've

11  heard him testify this morning that he's never had any sex

12  with either adult men or women, that his entire sexual

13  fantasy life and all of his sexual partners were children

14  between the ages of approximately eight to maybe 14 or 15.

15  Even those at the older range of that victim pool, he has

16  described them as being younger looking.  You know, the

17  children that he molested over in Southeast Asia may have

18  been 14 or 15, but they looked younger.  He described how

19  they were 12 or 13.  And he has also been really clear

20  about explaining that he -- his sexual fixation is on the

21  young looks, the smooth skin, the hairless bodies the

22  childlike qualities of the physique of children.

23  **THE COURT:**  And this deviant course occurred as his

24  sexuality was manifesting itself?  He said around 16 or 17?

25  A.  Exactly, Your Honor.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 66 of 134

1    **THE COURT:**  What would cause that?  Is it just an

2    aberration in human behavior?

3    A.   He began sexual activity with boys his own age when he

4    was approximately 12 years old.

5    **THE COURT:**  But he told me he was not the victim of sexual

6    predation.

7    A.   Correct.

8    **THE COURT:**  So what would cause that?

9    A.   I think he just got stuck developmentally.

10   **THE COURT:**  It's a deviation from norm.

11   A.   Absolutely, Your Honor.

12   **THE COURT:**  That's why it's a paraphilia.

13   A.   Absolutely.  It's a severe mental disorder under the

14   statute.  It's the exclusive pedophilia, which is more

15   dangerous in the sense that it is -- it begins earlier, a

16   younger age.  Exclusive male object pedophiles have more

17   victims than other sex offenders.  They recidivate more

18   quickly, and they continue to sexually offend into older

19   ages than all of the other types of child molesters.

20   **THE COURT:**  It's a minority paraphilia, isn't it?

21   A.   It is.  It's a very small subgroup, yes.

22   **THE COURT:**  It's a subset of the general deviant behavior

23   involving children.

24   A.   Well put.  Yes, Your Honor.  And in my opinion the

25   most dangerous and high risk subset.

1    **BY MR. JAMES:**

2    Q.   And with regard to the -- and you found -- that's

3    Prong 2 of your report --

4    A.   Yes.

5    Q.   -- in your findings; is that correct?

6    A.   Yes.

7    Q.   Let's go to the fact that -- are you aware that Mr.

8    Schmidt during his second offense for which he was

9    convicted, he was ordered to take -- or had Depo-Provera

10   injections.

11   A.   Right.

12   Q.   And that was meant to lower his testosterone, right?

13   A.   Right.

14   Q.   And in fact during the time that he was getting those

15   injections he had engaged in acts of sexual molestation

16   with children; is that correct?

17   A.   Yes, he did.

18   Q.   All right.  Let's go to another prong, prong 3,

19   difficulty refraining prong.

20   A.   Okay.

21   Q.   You have found that he would meet criteria for the

22   third prong; is that right?

23   A.   Yes.

24   Q.   And that is beginning at page Bates 1698 of your

25   report or Bates --

1     **THE COURT:** It would appear to me that some of the
2     retardant factors now given his situation, his age of 75
3     years old, prostate activity, lack of any collateral sexual
4     interest, pornography, things like that, and his physical
5     structural problems with sexual outlet, why given those
6     sort of objective factors is he still a risk?
7     A.   Okay, Your Honor.
8     **THE COURT:** Is that a fair question?
9     A.   Very good question. I believe he is still a risk. I
10    think his advanced age does not override all of the other
11    risk factors in his profile. He's very physically fit,
12    Your Honor. He's quite healthy. He exercises. He walks
13    an hour and a half every day. He does calisthenics
14    exercises in his cell. He can do ten pull-ups on a chin-up
15    bar. That's pretty physically fit for a 75 year old man.
16    He doesn't have any medical conditions, any kind of life-
17    threatening or disabling medical conditions. He takes meds
18    for high blood pressure and prostate problems, but he could
19    live another 15 years, 20 years. Who knows. I think it
20    has been pointed out that even though he claims that he no
21    longer has erections and his libido is low, he was saying
22    that back in 2000 when he was released.
23    **THE COURT:** Yes, but I find a great distinction between him
24    in 2000 and now it's 2018.
25    A.   Yes.

1 **THE COURT:** I think that the last expert tried to blend
2 those together, but I think they are sharply distinct. How
3 he was at 60 and how he is at 75 really don't overlap.
4 A. Okay. Fair enough. The bottom line for me, Your
5 Honor, he is what we call emotionally identified with
6 children.
7 **THE COURT:** No question about it. Even though he may not
8 have the physical climax or consummation of it, he -- you
9 think he is still a risk to play with children and sexually
10 contact them?
11 A. Yes. Because he has only ever been able to get his
12 emotional needs satisfied by children. He feels like a
13 child himself. He feels more comfortable with children
14 than adults. He gravitates toward children whenever he has
15 the opportunity.
16 **THE COURT:** His emotional or interpersonal development
17 ended when he was a teenager.
18 A. That's exactly how I see it, Your Honor. I think his
19 sexual -- psychosexual and emotional development got stuck.
20 It got arrested when he was a teenager, and he's never
21 grown up psychologically or emotionally himself. And his
22 choice of sexual objects never grew up. They were always
23 children.
24 **THE COURT:** Does that manifest itself in his willingness to
25 obey rules like never offend. He's subservient and willing

1   to stay in a structured environment?

2   A.   Perhaps.   He has always been very well-behaved.   He

3   has never been antisocial.   He doesn't abuse alcohol or

4   drugs.   He has always been able to follow all the other

5   rules except staying away from children.

6   **THE COURT:**   And going to foreign countries where that

7   exploitation exists is a bad sign, isn't it?

8   A.   Very bad, Your Honor.   I thought it was significant

9   that this morning he said when he got out of prison in 2000

10  he didn't plan on molesting any more children in the United

11  States, but once he got to Southeast Asia it was a field

12  day.   And he felt that there was free rein to do what he

13  wanted.   And so he -- he went on a course of -- his sexual

14  offending was almost had like a frenetic quality.   When he

15  was in the Philippines he had multiple victims.   He got

16  arrested for sexually molesting in the Philippines.   Went

17  to Cambodia, started doing it again.   The police came and

18  locked his door.   He went and found a hotel and continued

19  doing it after that.   He really could not stop himself.

20  **THE COURT:**   Okay.

21  **BY MR. JAMES:**

22  Q.   With regard to the protective factors, successful

23  completion of sex offender treatment is a known as a

24  protective factor; is that correct?

25  A.   Yes.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646     sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 71 of 134

1    Q.   And that's absent in this case?

2    A.   Yes.

3    Q.   All right.  In fact, isn't it true that failure at sex

4    offender treatment research has shown it makes one more at

5    risk than a sex offender who never had sex offender

6    treatment?

7    A.   That's correct, yes.  There's some research that shows

8    that if you fail and get kicked out of sex offender

9    treatment, which is what happened to him in the 1980s, the

10   last time he had treatment at Johns Hopkins University,

11   that you are actually more likely to reoffend than those

12   offenders who were never even in treatment.

13   **THE COURT:**  Treatment I'm assuming in the '80s was

14   antediluvian compared to what it is now.  I mean, what

15   science knows about the problem now is light years more

16   than it did then.

17   A.   Good point, Your Honor.  However, in his case he was

18   going to one of the best treatment programs in the country

19   at Johns Hopkins University.  He was also getting Depo-

20   Provera at that time.  That was a very forward thinking

21   newly --

22   **THE COURT:**  Experimental.

23   A.   Experimental treatment.  Normally that works really

24   well because it knocks out your testosterone.  It knocks

25   out your libido.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 72 of 134

1    **THE COURT:**  Well testosterone is not his problem.

2    A.    Exactly.  And he committed sex offenses while he was

3    under the influence of Depo-Provera.

4    **THE COURT:**  Yes.  I'll recognize you as an expert.  What's

5    your educational background?

6    A.    I have my Bachelor's degree from Stanford University

7    in Psychology.  My Master's degree from Harvard University

8    and my Ph.D. from University of California at Santa

9    Barbara.  I'm licensed in California as a forensic

10   psychologist.

11   **THE COURT:**  And you testified in two or three of my prior

12   cases?

13   A.    I have, Your Honor, yes.

14   **THE COURT:**  Okay.

15   **BY MR. JAMES:**

16   Q.    Now, regarding his emotional congruence with children,

17   that's a factor, a dynamic risk factor --

18   A.    Yes.

19   Q.    -- with regard to Mr. Schmidt; is that correct?

20   A.    Yes.

21   Q.    In fact, other than the times that he had been

22   incarcerated, Mr. Schmidt had never ceased or desisted from

23   engaging in acts of child molestation, based on the record;

24   isn't that correct?

25   A.    Yes.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 73 of 134

1    Q.   You testified he is a healthy man for his age?

2    A.   Yes.

3    Q.   He has no medical conditions --

4    A.   Correct.

5    Q.   -- that would stop him from engaging in the type of

6    molestation that he has even admitted, the sort of

7    fondling, the hands?

8    A.   Yes.  He said -- this is important -- that giving

9    children pleasure gives him pleasure.  He doesn't even

10   necessarily need a direct stimulation to his own genitals

11   so to speak.  But by pleasing them, by arousing them, by

12   bringing them to climax, that kind of pleasure brings him

13   pleasure.

14   Q.   What about sexual coping?

15   A.   I think that he clearly exhibits this -- this is a

16   dynamic risk factor that when the going gets rough he goes

17   back to boys.  And he has had some sort of clusters of

18   sexual offenses where he will reoffend even while he is

19   awaiting court, you know, resolution of a prior case.  He

20   reoffends when he is on probation.  He is really quite

21   compulsive in doing so.  So, yes, I think he definitely has

22   evidence of that risk factor.

23   **THE COURT:**  And the compulsiveness you consider to be the

24   factor that deals with whether he has serious difficulty?

25   A.   Yes, Your Honor.

1   **THE COURT:**  Compulsiveness trumps serious difficulty?

2   A.   I believe so, Your Honor.  He may have gone for some

3   periods of time without offending.  He didn't do so while

4   he was in the military.  But he always went back to it.  He

5   was always on the lookout for new victims, and he was

6   never able to completely stop.  And I think if he had

7   access to an attractive 12 year old boy that somehow came

8   into his orbit, he would have serious difficulty -- you

9   know, befriending that boy, having physical contact with

10  that boy, and then eventually molesting that boy.

11  Q.   You would agree that his pattern of offending

12  indicates that he befriends boys, often from fatherless

13  homes, mothers who are in economic need and he provides

14  those needs.

15  **THE COURT:**  He grooms people.

16  Q.   He grooms.  He grooms children?

17  A.   He grooms children, and he's good at identifying

18  vulnerable children who are needy, as Mr. James said, as

19  well as street hustlers, you know, male pros-- child

20  prostitutes.  He's good at finding those victims.

21  **MR. JAMES:**  I'm almost finished, Your Honor, a few more

22  questions.

23  Q.   Mr. Schmidt had not engaged in any sort of sex

24  offender treatment since 1986; isn't that correct?

25  A.   Yes.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 75 of 134

1  Q.  And just to conclude, Your Honor.

2      In your report you detail actuarial measures that you

3  examined and you also detail dynamic risk factors.  Those

4  are listed in your report.  Is that correct?

5  A.  Yes.

6  Q.  And those deal with BOP guidelines?

7  A.  Yes.

8  Q.  And during your interview with Mr. Schmidt, he told

9  you -- this is on page 21, the last page of your report.

10 This is in reference to successful completion of a sex

11 offender treatment program.  He acknowledged to you,

12 "Pedophilia is twisted through my whole life."

13 A.  That's correct.

14 Q.  So he said his entire life, entire being had been

15 twisted with pedophilia?

16 A.  That's right.

17 Q.  That's driven his actions?

18 A.  Yes.

19 Q.  His molestations?

20 A.  Yes.

21 Q.  His violations of supervised release?

22 A.  Yes.  And if I could just quickly add, he said that

23 because what he meant was, you know, after his second

24 arrest he lost everything: lost his job, lost the store he

25 was managing, lost his home, lost all his friends.  And he

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646     sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 76 of 134

1    said, all I had left was my pedophilia.  It was so twisted
2    throughout my life that this was all I had left.  Therefore
3    I submitted to it.  So when he gets in trouble for
4    molesting children, instead of backing off and controlling
5    himself --
6    **THE COURT:**  He becomes passive.
7    A.   Well, he embraces it even more because it's the only
8    thing that gives him any meaning in life.
9    Q.   Why do you believe lifetime supervised release would
10   be insufficient to protect the community?
11   A.   I think for all of the things we've already said here,
12   you know, the fact that he's got this emotional congruence
13   with children.  He has no other way of finding, you know,
14   of making contact with others.  He's never been able to
15   relate to adults.  He feels like a child himself.  He's
16   always been more comfortable with children.
17   **THE COURT:**  Does he have a difficulty, a challenge that in
18   rejecting his behavior he's rejecting his very essence?
19   A.   I think that's a good way to put it, Your Honor, yes.
20   This is like the core of who he is, and if he doesn't have
21   that it's like he doesn't exist.
22   **THE COURT:**  Do you think therapy will help him on that?
23   A.   I -- I -- it's hard to know whether, you know, at his
24   age and because this is so deeply imprinted in him that --
25   it will never cure him of his sexual interest in boys.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646     sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 77 of 134

1  THE COURT:  I mean, one of the problems with a 75 year old
2  who has been in prison for 15 years is that it's
3  existential.  It's like no exit.  I mean if you sentence
4  him under Adam Walsh and he can only get out by
5  successfully completing the treatment and it's inevitable
6  that he never will complete the treatment, you're giving
7  the person a doomsday sentence.
8  A.   Well, I'm not sure I entirely agree with that, Your
9  Honor.  I think if he had a -- a significant, lasting
10  relationship with a therapist, that would give him the
11  experience of being able to connect with another adult
12  emotionally.  And I also think he needs to -- it would --
13  I'd be more comfortable seeing him released after he had
14  some treatment and understood relapse prevention and
15  developed a relapse prevention plan so that he identified
16  what his risk factors are and had real concrete strategies
17  in place to help him avoid relapsing.
18  THE COURT:  But he hasn't come to grips with that yet?
19  A.   Never had that kind of treatment yet.  And that's more
20  recent, more modern treatment, like you were saying, than
21  what was available in the '80s.
22  THE COURT:  Okay.  Thank you.
23  MR. JAMES:  No further questions, Your Honor.
24  THE COURT:  Do you have any questions?
25  MR. TARLTON:  Just briefly, Your Honor.

1        CROSS-EXAMINATION

2    **BY MR. TARLTON:**

3    Q.    In your report you noted that the studies say that

4    '60s are rare for recidivating, that anything over age 70

5    is even rarer?

6    A.    Correct.

7    Q.    And then also you've rejected his advanced age at 75

8    as a protective factor because of your assessment of his

9    biological status?

10   A.    I think -- I think he is very healthy and physically

11   fit for a 75 year old man.  So I think his age alone is not

12   -- does not carry enough weight to protect him and keep him

13   safe at this point.  It doesn't override all of the other

14   risk factors in this case.

15   Q.    Okay.  Thank you.

16   A.    Uh-huh.

17   **THE COURT:**  I'm usually a skeptic/critic of the Static-99

18   just because I've heard a lot of it.  He has, I thought I

19   heard, three or four, his score?

20   A.    Four.

21   **THE COURT:**  Four?

22   A.    Yes.

23   **THE COURT:**  In the world of Static-99s that's not a high

24   score, is it?

25   A.    It's not a particularly high score.  It's -- I

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 79 of 134

1  wouldn't say it's -- it's certainly not a low score.  It's
2  an above average score.  And he also got a three point
3  reduction because of his advanced age.
4  **THE COURT:**  That's what I was thinking.
5  A.   And he's still relatively high, comparatively.  So,
6  you know --
7  **THE COURT:**  I mean some of the people I see have 8's and
8  9's, and it's like, okay, why are we here?
9  A.   And, you know, before age 60 he was -- honestly, I
10 would have to go back and recalculate it, but he was higher
11 and now he's lower because he's older.
12 **THE COURT:**  Only because of the age.
13 A.   Only because he's older, right.
14 **THE COURT:**  Thank you for being here.
15 A.   Thank you, Your Honor.
16 **THE COURT:**  We'll take a brief recess and you can be ready
17 with your next witness if you have any.  If not, we'll got
18 to the defendant.
19 **MR. JAMES:**  Yes, Your Honor, we would have to go to the
20 defendant.
21 **THE COURT:**  You have a witness that's not here today.
22 **MR. JAMES:**  That's correct.
23 **THE COURT:**  We'll come back and hear from the Respondent.
24         (Court recess 11:55 a.m. - 12:10 p.m.)
25 **THE COURT:**  Do you want to call your first witness?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 80 of 134

1    **MR. TARLTON:** Yes, Your Honor. We would call Dr. Fabian

2    Saleh.

3             **DR. FABIAN SALEH, RESPONDENT'S WITNESS, SWORN**

4                     DIRECT EXAMINATION

5    **BY MR. TARLTON:**

6    Q.   Good afternoon, Dr. Saleh. Have you testified in

7    front of this Court before?

8    A.   I don't remember.

9    Q.   Okay. What about in federal court?

10   A.   Yes, I have.

11   Q.   And you're an M.D., not a Ph.D; is that correct?

12   A.   I'm an M.D., yes medical doctor.

13   Q.   You're a psychiatrist?

14   A.   Forensic psychiatrist, yes.

15   Q.   Do you have any kind of treatment practice as well?

16   A.   I didn't hear.

17   Q.   You have a treatment practice?

18   A.   Yes. I'm, as I pointed out, a forensic psychiatrist

19   and a child and adolescent psychiatrist and a general

20   psychiatrist. So I see patients both in my private

21   practice and also at Beth Israel Deaconess Medical Center I

22   see patients. And I run the Sexual Violence Prevention and

23   Risk Management Program also at Beth Israel Deaconess

24   Medical Center in Massachusetts, Boston, Massachusetts.

25   Q.   Will you also tell the Court just a little bit about

1    your teaching, where you teach?

2    A.    So I'm Assistant Clinical Professor with Harvard

3    Medical School.  I have been with the Harvard Program since

4    2008, and prior to that I was with UMASS Medical School in

5    Massachusetts.  And this is following my training.  I

6    trained in Italy where I did my medical school in Florence

7    and then did my internship at Case Western Reserve

8    University in Cleveland, Ohio.  My training in psychiatry

9    at Johns Hopkins Hospital at the National Institute For the

10   Study, Prevention and Treatment of Sexual Trauma.  I worked

11   there as well and then did my forensic fellowship in

12   forensic psychiatry at UMASS Medical School and then stayed

13   on with UMASS Medical School for several years but then

14   joined the Harvard Program and have been with them ever

15   since.

16   Q.    Have you testified for state or federal prosecutors or

17   governments seeking to commit people before?

18   A.    Yes, I have.

19   Q.    I believe you said you have testified about on 240

20   occasions.  How many times have you been asked to evaluate

21   cases?

22   A.    I have been retained as an expert in probably over my

23   best guess would be at least 1,500 times if not 2,000 times

24   but ended up testifying in 220 -- on 220 occasions.

25   Q.    Okay.  Is it fair to say your opinion is not always

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 82 of 134

1    helpful to the party that retained you?

2    A.    Actually most of the time it has not been helpful to

3    the party who retained me on a given case, yes.

4    Q.    Let's talk about this case.  To a reasonable degree of

5    professional certainty, do you have any opinions about

6    whether Richard Schmidt meets the criteria for commitment

7    under the Adam Walsh Act?

8    A.    Well, based on the totality of the information before

9    me, including Mr. Schmidt's own testimony today and the

10   testimony of the other two experts, I don't think that I

11   have -- that the data don't support his commitment as a SDP

12   at this given point in time.  There are certainly serious

13   concerns raised, and I would agree with it.  I agree with

14   his history, which is troublesome to say the least, but at

15   this point in time I don't think he meets the strict

16   language of a sexually dangerous person as defined by

17   statute.

18   Q.    Is that on the volitional impairment element or prong

19   of the statute?

20   A.    The problem with this case is that in my opinion one

21   can't look at the case in a vacuum.  And the vacuum would

22   be if I were just to stop the assessment in 2000 and say,

23   well, that's all what we have to consider.  And that's not

24   the case.  I mean the case is, yes, he is a repeat

25   offender.  He repeated or engaged in sexual offending

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 83 of 134

1    behaviors while on parole, left the U.S., went to the

2    Philippines, went to Cambodia, offended and then was

3    arrested, came back and then was sentenced.  If I had to

4    consider all the information up to 2000 I would say, yes,

5    he meets commitment criteria.  But I can't disregard the 17

6    years of time or 15 plus years of time that follow his most

7    recent arrest.  Because what one has to consider is that he

8    has aged during the course of the last 15 years.  That is

9    something that one can't disregard.  And so given that I

10   can't look into this case -- or at this case in a vacuum, I

11   have to consider these last 17 years, and there is just no

12   data before me to support today that he meets commitment

13   criteria as a sexually dangerous person.  All the history I

14   agree with.  I mean, it's a problem history.  I disagree

15   with the diagnosis, the subtype diagnosis of pedophilia

16   exclusive type.  He is somebody who presents with

17   pedophilic disorder nonexclusive type.  But that aside,

18   given the information before me, in my opinion he does not

19   meet commitment criteria as a sexually dangerous person at

20   this given point in time.

21   **THE COURT:**  Does he suffer from antisocial personality

22   disorder?

23   A.   No.  There is no evidence in support of a disorder.

24   **THE COURT:**  And why do you believe that his pedophilia is

25   not exclusive?

1  A.   So the diagnostic criteria as described in the DSM-5,

2  the Diagnostic and Statistical Manual, the fifth edition,

3  makes a distinction between the exclusive type and the

4  nonexclusive type, and it is based on sexual interest,

5  arousal to anything other than prepubescent children.  With

6  regard to Mr. Schmidt he has certainly offended against

7  children but children using the term are not all

8  prepubescent.  He has had interest in pubescent children

9  but his report has interest in postpubescent children, and

10  that would make his pedophilic disorder nonexclusive type

11  of pedophilic disorder.  So he is not just interested in a

12  prepubescent boy, but is interested in the pubescent and

13  postpubescent age group as well.

14  **THE COURT:**  So the postpubescent age group is between, say

15  13 and 16?

16  A.   Thirteen (13) to 16.  Depends on the -- ultimately on

17  the developmental level of the child because sometimes boys

18  mature at a later time so they may be still prepubescent at

19  the age of 14 and vice versa where a child may be 13 years

20  of age yet has already entered puberty.

21  **THE COURT:**  What is the common name for that age group?

22  A.   What has been used was hebephilia.  At the age of --

23  **THE COURT:**  Hebephilia, yes.  So you think that

24  distinguishes him because of the hebephilia from being

25  exclusive?

1    A.   Just turning to the language of the DSM, yes.  That's

2    where the difference is, and in my report I gave him a

3    diagnosis of both the pedophilic disorder, nonexclusive

4    type and what the DSM-5 calls the other specified

5    pedophilic disorder, and within that group I would consider

6    the interest that he had shown to the pubescent and

7    postpubescent age group.

8    **THE COURT:**  But he has no interest in adults or in

9    heterosexual behavior?

10   A.   Absolutely correct, yes.

11   **BY MR. TARLTON:**

12   Q.   The diagnosis that you reached, do you have any

13   opinion about the diagnosis as it impacts on volitional

14   control issues?

15   A.   I'm not sure I fully understand the question.

16   Q.   You said that he doesn't have an active and

17   symptomatic paraphilia right now at 75 years old.  What do

18   you mean by that?

19   A.   What I mean by that is -- I think the best way to

20   answer this question is to compare his presentation today

21   to how he presented in the '80s, '90s or at the time when

22   he left the U.S..  During those times he had the pedophilic

23   disorder.  He was symptomatic, so he had active symptoms of

24   that disorder.  And the result of that disorder he would

25   act out despite the fact that he was supposed to follow

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 86 of 134

1    through and answer to the parole, for example, not

2    withstanding that he ended up acting out sexually.  That's

3    how he presented back then.  But at the present time there

4    is no evidence to suggest that he has this active

5    pedophilic disorder presentation as he did 15 plus years

6    ago.

7    Q.    Okay.  You listened to Dr. Zinik's testimony about

8    emotional congruence with children and how that impacts

9    risks.  What's your assessment of that?

10   A.    I agree with Dr. Zinik in part because there is

11   certainly something to be said that Mr. Schmidt was drawn

12   to children.  And as the term was used, groomed children to

13   get close to them and at times it wouldn't serve just the

14   purpose of him having subsequently sexual contact with

15   them.  But, again, what I think one has to do as well is

16   when it comes to understanding the emotional congruity that

17   he had for children I have to ultimately look at how he

18   presented over the last 15 years where he has had no

19   contact with children and you have to also then look at his

20   psychological presentation over the course of the last 15

21   years.  If his essence is solely based on him being close

22   to children, he wasn't close to children for the last 15

23   years so one would have to conclude that he was not whole

24   as a person and you would see some byproduct as a result of

25   this absence access to children over the last 15 years.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646     sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 87 of 134

1    And there is nothing that I could read in the records that
2    he was in any sort of emotional distress, depressed, sad or
3    not able to function because he didn't have access to
4    children over the last 15 years.  So that therefore I would
5    not give it as much weight as Dr. Zinik did to the notion
6    that his offending behaviors are solely drawn or driven by
7    him wishing to be close to children.  He wasn't close to
8    children for the last 15 years and functioned well in the
9    environment in which he found himself to be in.
10   **THE COURT:**  He has never undergone treatment?
11   A.   I would think -- agree with this in part.
12   **THE COURT:**  Well, very early he had treatment in Johns
13   Hopkins.
14   A.   Yes.
15   **THE COURT:**  Okay.  Other than that he hasn't been engaged
16   in treatment in 30 years?
17   A.   That's correct, yes.
18   **THE COURT:**  And what's the likelihood, in your opinion,
19   that this condition would resolve itself or stop being
20   active in the absence of any treatment?
21   A.   I don't think he is going -- even if he were to be
22   offered treatment I'm not sure that he would benefit from
23   treatment because he has not -- I mean the issue of age
24   again comes into play.  He is 75 years old and he is who he
25   is.  I mean that's essentially what I think about Mr.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646     sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 88 of 134

1    Schmidt.  And so, yeah, I don't think that treatment per se
2    would be any beneficial in terms of changing who he is in
3    terms of changing his psychology.
4    **THE COURT:**  Well, does that conclusion cause you to believe
5    that he won't have serious difficulty or if you acknowledge
6    that he would have serious difficulty and treatment is
7    inoperative, then he's just left with no recourse.
8    A.    I think he needs supervision and monitoring.  And as
9    far as I understand his case he will be supervised and
10   monitored if he were to be released from the BOP.  That is
11   what is going to, in my opinion, to at least keep him in
12   control and the community safe.  But it's not that through
13   treatment that he would change his way of thinking with
14   regard to himself and then as a result be safe in the
15   community.  Supervision I think in his case is going to be
16   important, and I understand that he is going to be on
17   supervision for the rest of his life if he were to be
18   released from the BOP.
19   **THE COURT:**  Okay.
20   **BY MR. TARLTON:**
21   Q.    Dr. Saleh, given Richard Schmidt's diagnosis, the
22   specifics of it, if he lacked volitional control today,
23   serious difficulty with volitional control today, if he had
24   that, what would you expect to see in his prison behavior?
25   A.    You would expect to see something in those 15 years,

1 so it wouldn't go unnoticed if he truly had difficulty

2 controlling sexual impulse or desire for sexual activity

3 with children and I would then use the -- I mean both

4 prepubescent and pubescent and postpubescent children you

5 would expect to see something. I understand he has had no

6 access to children. There are no children in the BOP. And

7 so you would expect him to engage in some behaviors to

8 satisfy this void that he would have, and he has not. And

9 then again going back to the issue of the emotional

10 closeness that he has for children and, again, based on the

11 data before us he has not had any contact with children so

12 one would have to conclude if one were to accept the

13 hypotheses of the who he is in terms of his essence that

14 that void would cause some sort of psychological stress in

15 him so you would see depression, anxiety, inability, say,

16 to sleep because he is not close to children. And I have

17 not seen anything in the records that would suggest that.

18 Q.   What about fantasy stories or drawing images?

19 A.   I mean, again, this is what I typically see in cases

20 of people with pedophilic disorder, specifically if I'm

21 going to accept Dr. Zinik's opinion about that he has the

22 exclusive type of pedophilic disorder that they would

23 substitute the presence of a child via drawings, for

24 example, or associating with inmates who looked very young,

25 engage in sexual activity with inmates who looked

1    childlike, for example.  And, again, there is nothing here

2    with regard to Mr. Schmidt.

3    Q.    What about hearing Mr. Schmidt -- you heard his

4    testimony.  Do you think he has shown any level of insight

5    into his criminal behavior in the past?

6    A.    I certainly have to say that he is -- this is what I

7    would say about this: that he is a well-spoken individual,

8    intelligent individual and so one could certainly say,

9    well, he tells you only what he thinks you want to hear to

10   be able for him to come into court and testify that he has

11   gained insight.  But -- so that's a possibility certainly

12   that I wouldn't dismiss.  But that being said, because he

13   is an intelligent individual and he has actually

14   experienced the consequences of his behaviors, he certainly

15   understands that he can't allow himself any false step or

16   misstep, actually, if he were to be released.  And he has

17   expressed no desire to act out sexually.  So I can't

18   dismiss his position, his points entirely by just saying he

19   is trying to manipulate people around himself to present

20   himself as an insightful individual.  I do think that he

21   has gained insight in understanding, certainly into the

22   nature of his sexual disorder and as well into what he is

23   supposed to do if he were to be released back into the

24   community.

25   Q.    In light of your medical training and teaching, what's

1    your understanding of the biological process and changes to
2    the male body between 60 and 75?
3    A.   So, again, as I suggested before, I don't think that
4    this -- his case, Mr. Schmidt's case, is the case of
5    somebody who offended because he had just this unmet sexual
6    need and sexual drive and had sex with children.  That's
7    not his case.  That's not the case if you want to be driven
8    just by testosterone, the male sex hormone.  It's not the
9    case of somebody who is acting out or has acted out
10   sexually because he just cares less about the feelings and
11   emotions of others and just does what he wants to do as you
12   may see in a person who has an antisocial personality
13   disorder.  And it's not the case of somebody who acts out
14   sexually because of drugs or alcohol.  That being said,
15   and, again, it's my opinion important to be mindful of the
16   fact that Mr. Schmidt is indeed and that's the objective
17   data he is 75 years of age, and people change with aging in
18   terms of their stamina, in terms of their ability to
19   function sexually.  Even if his behaviors were not driven
20   by sexual drive merely, people's desire for sex decreases.
21   Their interest in sexual activity decreases with age.  Even
22   if they don't have the drive to act out or engage in sexual
23   activity, their desire decreases.  And so that is what I
24   think has happened to Mr. Schmidt over the course of the
25   last year, 15 years, that there was, as one would expect, a

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 92 of 134

1    steady decline in drive and desire and his presentation is
2    the way he presents now today, somebody who had other
3    objectives, other goals as he had when he was in his '40s,
4    '50s or late '50s.  And equating his presentation today
5    with how he presented 15 plus years ago I think it would be
6    just, again, in my opinion, an error because you can't
7    disregard 15 years of somebody's life specifically in this
8    age group.  I mean if he were 35 years old and you were
9    talking about a 50 year old individual today I would say,
10   well, it may not be as relevant, the 15 years, because the
11   ability to function has really not significantly changed.
12   But going from 60 to 75, there is certainly a significant
13   change in a person's biology and physiology.
14   Q.   You heard Dr. Zinik's impression about Mr. Schmidt
15   seems physically fit for his age.  What's your thoughts on
16   that?
17   A.   Again, it's -- he seems fit certainly.  He is not --
18   doesn't look obese.  He doesn't need a wheelchair to walk
19   around, but that is not an assessment of a person's status
20   to say, well, he seems fit.  Again, I think one has to
21   really think about what aging does to the body of an
22   individual.  And, again, I don't know if I have seen an
23   image of Mr. Schmidt when he was in his '50s or '60s, but
24   he looks certainly like an older individual, age 75.  And
25   so just equating looking physically fit to actually going

1    out and offending sexually against children I think, again,

2    it's a stretch, in my judgment.

3    Q.    Is stress offensive for somebody as small as Mr.

4    Schmidt and 15 years of it impact the aging process?

5    A.    Certainly there is something in the literature on

6    stress and the speed of aging, so if I'm exposed to

7    stressful events the speed of aging certainly increases.

8    But at this point I don't know if he was stressed or the

9    extent of the stress that he has been confined in prison

10   but I just look at, again, the facts and the data before

11   me, the objective data  before me, and the objective data,

12   as I said, he is 75 years of age.  There is no evidence

13   whatsoever of any sexual acting out or behavior over the

14   last 15 years.  No evidence of masturbation, erections,

15   nothing whatsoever.  In part that's expected.  I mean

16   that's what you would expect to see in somebody who is his

17   age who has enlarged prostate, to see that there is this

18   decline and shift in interest and desires.

19   Q.    Is it important to your opinion that he doesn't suffer

20   from antisocial personality disorder or a substance abuse?

21   A.    I would say in part I would say certainly yes.  And

22   because he didn't suffer from either condition when he was

23   in his '40s or '50s when he was actively offending.  But

24   certainly it's important if he, hypothetically speaking,

25   were to present today with antisocial personality disorder

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 94 of 134

1    and substance use disorders, my opinion actually would be

2    different.  Because those vulnerabilities I would have to

3    account for if he were to be released.  In his case there

4    is no such risk factor of him being antisocial in terms of

5    the disorder or somebody with a substance use disorder.

6    Q.   Is it important to your opinion that setting aside the

7    paraphilic disorder, you found any other illness, assuming

8    he had it.

9    A.   Certainly.  Sex offenders who present with pedophilic

10   disorder and on top of the pedophilic disorder they have

11   various mental health conditions, psychiatric disorders,

12   and Mr. Schmidt does not present with any coexisting mental

13   illness.

14   Q.   Thank you.  No further questions, Your Honor.

15   **THE COURT:**  Any cross?

16   **MR. JAMES:**  Yes, Your Honor.

17                        CROSS-EXAMINATION

18   **BY MR. JAMES:**

19   Q.   On page 11 of your report, which is Respondent's

20   Exhibit Number 5, I believe, under your diagnostic opinion,

21   you've testified here today that you did not find that Mr.

22   Schmidt suffers from antisocial personality disorder,

23   correct?

24   A.   Right.  He does not suffer from the disorder.

25   Q.   But you did, in fact, find that he suffered from other

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 95 of 134

1    specified personality disorder with traits of antisocial
2    personality disorder; is that correct?
3    A.    As a result of the offending behaviors, yes, and the
4    rule violations.
5    Q.    So you did find a personality disorder then?
6    A.    Right, but not the antisocial personality disorder.
7    Q.    But you found -- the disorder he has has traits of
8    antisocial personality disorder?
9    A.    Yeah, based on his history -- yes, based on his
10   criminal behaviors.  That's the basis of the traits, yes.
11   Q.    And those criminal behaviors include his offending
12   while he was on supervision?
13   A.    Sure, yes.
14   Q.    Which, of course, is a dynamic risk factor; isn't that
15   correct?
16   A.    It's a risk factor if present, yes, sure.
17   Q.    You've also found he suffered from unspecified
18   paraphilia disorder.  That's in reference to the pubescent
19   boys?
20   A.    Pubescent boys, yes.
21   Q.    So that would be boys who were 14 years old?
22   A.    It's actually you look at the stages of development.
23   It's not just based on the age, but, yes, it would be
24   pubescent kids, boys who have entered puberty.
25   Q.    All right.  And pubescent boys would be boys who would

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 96 of 134

1  start to have some body hair, secondary sex

2  characteristics?

3  A.   Yes.

4  Q.   Now you read his deposition; is that correct?

5  A.   I did, yes.

6  Q.   And in his deposition he stated that he was sexually

7  attracted to boys, and this is when he was in Southeast

8  Asia, boys who were -- had smooth skin and a lack of body

9  hair?

10 A.   Right.

11 Q.   And that would indicate prepubescence; isn't that

12 correct?

13 A.   That is incorrect.  You don't diagnose or don't talk

14 about puberty or somebody entering puberty whether they

15 have just body hair or not.  That's not the sole

16 characteristic that you have to consider when you determine

17 if somebody is entering puberty or not.  So there are other

18 factors that you consider when it comes to sexual

19 development in boys.

20 Q.   Well, one of those factors is in terms of prepubescent

21 boys generally have smooth skin and they lack body hair?

22 A.   That's true, yes, for prepubescent.

23 Q.   Now you of course found Prong 1 and you did find Prong

24 2.  You found paraphilic disorder as well.  And you would

25 agree that the other disorder you found, the other

1    specified paraphilic disorder, that would also be a serious
2    mental illness, abnormality or disorder?
3    A.   It certainly would, yes.
4    Q.   All right.  And that in conjunction with the other
5    specified personality disorder with reference to antisocial
6    personality disorder in combination that would also be a
7    serious mental illness, abnormality or disorder, in Mr.
8    Schmidt's case?
9    A.   I should say, as I stated earlier, he doesn't present
10   with any of that for the last 15 years.  So historically
11   speaking certainly it's important to be looked at from a
12   diagnostic perspective, but if I look at the case today,
13   there is no evidence whatsoever in support of any
14   antisocial personality disorder related traits.
15   Q.   Now for the last 15 years he has been in prison, has
16   he not?
17   A.   Sure, yes.
18   Q.   And in prison there are no outlets of -- there are no
19   little boys?
20   A.   There are no little boys.  That I can safely say, yes.
21   Q.   All right.  Now isn't it true that in your review of
22   the records and in your clinical interview with Mr. Schmidt
23   he never told you and there's no record evidence of him
24   ever acting out while he was doing his 18 year state
25   sentence; isn't that correct?

1    A.    That's correct, yes.

2    Q.    So when he was doing his 18 year state sentence he was

3    away from boys, right?

4    A.    Yes.

5    Q.    All right.  He wasn't collecting pictures?

6    A.    That's right, yes.

7    Q.    He wasn't trying to have sex with inmates who appeared

8    to be young?

9    A.    As far as we know.  There is no documentation, yes.

10   Q.    He never spoke of any of that to you during his

11   clinical interview either?

12   A.    He did not, no.

13   Q.    In fact in his testimony yesterday he was basically a

14   model prisoner every time he has been incarcerated?

15   A.    Yes.

16   Q.    So that behavior when he was in prison 18 years is

17   consistent with the same behavior he has had for the last

18   15 years on his federal sentence; isn't that correct?

19   A.    In part.  Because, again, you are looking at it in my

20   view in a vacuum.  The fact is that, yes, he had continued

21   to show appropriate behaviors in the prison system.  Yet at

22   the same token he is aging and is getting older, so he is

23   not the 60 year old individual or the 35 year old

24   individual, but he is a 75 year old individual.  In five

25   years he is going to be 80 and in ten years 85 years of

1    age.

2    Q.   So you're basing -- correct me if I'm wrong -- you're

3    basis your Prong 3 analysis mainly on the fact that he has

4    aged 15 years from the time of the what we call the index

5    offense to now, right?

6    A.   Again, I -- the way I -- I think I agree with that

7    certainly in part, but it's looking in my view at his case

8    at the totality of the data before us.  And, again, I have

9    to consider the fact that he is aging and has aged over the

10   course of the last 15 years.  So you can't just equate Mr.

11   Schmidt today with Mr. Schmidt in 2000 and say, well, this

12   is exactly -- because that is ultimately the way one would

13   have to think about this is that Mr. Schmidt today is

14   exactly the same type of individual who he was in 2000 when

15   he was arrested when he was overseas, and that's not the

16   case.  That's what, in my opinion, would be an error

17   because he is not the same individual.  He has

18   significantly aged.

19   Q.   Research shows that when an individual is 40 years

20   old, that's when the decline begins, around age 40; is that

21   correct?

22   A.   Decline for what?

23   Q.   Decline for sexual offending.

24   A.   I mean there are three bodies of literature that we

25   look at.  One is the literature that addresses age and

1    sexual recidivism in the sex offender.  Then there is the

2    body of literature that looks at age and what age does to

3    an individual being, with or without offending behaviors.

4    Q.   The literature with regard to sex offenders, that's

5    what I'm talking about.

6    A.   Okay.

7    Q.   Doesn't it say that the decline for recidivism begins

8    around age 40?

9    A.   That's right.

10   Q.   Isn't that right?

11   A.   That's correct, yes.

12   Q.   And that would be a typical sex offender?

13   A.   If there is any typical sex offender.  That's what the

14   literature shows.

15   Q.   That's what the literature shows, right?  Now at the

16   age of 41 that's when Mr. Schmidt was first detected.

17   A.   Right, yes.

18   Q.   And there is evidence in the record that he continued

19   to offend sexually when he was age 43, right?

20   A.   Yes.

21   Q.   And then he was convicted, spent 18 years in prison

22   and was released when he was 57, right?

23   A.   I don't think he spent 18 years in prison.  He was

24   released early on parole, but he was eventually released

25   after being sentenced -- he received an 18 year sentence

1    but didn't do the whole 18 years.

2    Q.   All right.  He received a significant sentence and was

3    released when he was 57 years old?

4    A.   That's correct, yes.

5    Q.   Now when he was 57 years old he began -- at a point

6    when he should have been decreasing, right, in terms of the

7    literature with regard to sex offending.

8    A.   In general, if you talk in general terms, look at the

9    core data, that's right.  That's correct.

10   Q.   And he then began violating his parole by associating

11   with a minor, right?

12   A.   That's correct, yes.

13   Q.   Engaging in what you would agree would be grooming

14   action; isn't that correct?

15   A.   Yes, I would agree with that.

16   Q.   And then that risk factor of violating supervision

17   where he had fled the United States, right?

18   A.   He fled the United States, yes.

19   Q.   And when he was overseas in the Philippines when he

20   was 60 years old he sexually offended against boys?

21   A.   That's what we understand.  Yes, he did.

22   Q.   Then he was arrested in the Philippines for sexually

23   offending against boys?

24   A.   I think Cambodia, but --

25   Q.   Well, he was arrested in the Philippines as well;

1  isn't that correct?

2  A.   Actually, you're right.  I think he was arrested in

3  the Philippines and then made it over to Cambodia.

4  Q.   Right.  Then he went over to Cambodia.  And in

5  Cambodia again he sexually offended against boys even after

6  he had been arrested?

7  A.   I think he -- as far as I recall it at this point.  I

8  don't remember if he offended against boys or if he

9  associated with a 15 year old boy.  I don't remember the

10  detail, but I certainly have to say that he engaged in

11  behaviors that were certainly troublesome, if not criminal

12  in nature.

13  Q.   Wouldn't you agree that he was more of atypical sex

14  offender than a typical one?

15  A.   Actually, I disagree with the qualifier of typical or

16  nontypical because there is no such thing in my opinion,

17  first of all.  Secondly, let's qualify his course.  I mean

18  he is and presented with a sexual disorder, has had sexual

19  needs and engaged in behaviors to satisfy those needs.  So

20  I don't see that as being atypical for who he was, how he

21  presented back then.

22  Q.   And you don't believe if Mr. Schmidt was ordered to

23  participate in sex offender treatment that would reduce his

24  sexual dangerousness?

25  A.   The way I would answer this is, I don't know if it

1   would reduce his risk per se. I don't think -- because I
2   don't know how many years he is going to live, first of
3   all, and who the provider is, what the treatment or the
4   modality is that he would be subjected to. I don't know.
5   I certainly don't see that as being detrimental for him to
6   talk to somebody, to a therapist, but to necessarily reduce
7   the risk merely because of him engaging in treatment or
8   counseling, I don't think that that is what is going to
9   ultimately reassure people that he is safe, that he is in
10  treatment.
11  **MR. JAMES:** I'm getting ready to wrap up, Your Honor, with
12  this witness.
13  Q.  You would agree with me, would you not, that the type
14  of molesting that Mr. Schmidt has engaged -- has self-
15  reported does not involve the use of an erect penis. He's
16  talking about the molestation, using his hands to caress
17  and molest boys?
18  A.  So molesting meaning touching, say, the child's
19  private area?
20  Q.  Yes. He has specified that he has touched their
21  private area, he has rubbed them. He has been naked with
22  them in the bed, body caressing.
23  A.  Yes, sir.
24  Q.  Whether or not Mr. Schmidt can actually gain an
25  erection, he can do all of those things without an

1    erection?

2    A.   But that's not the issue.  But the answer would be

3    true to what you said, but that's not the issue here.  It's

4    not about him having an erect penis or not an erect penis.

5    Able to maintain or not maintaining an erection is really

6    not what I'm talking about.  But I agree certainly with

7    your point that offending against a child does not require

8    the offender or perpetrator to have a full penile erection.

9    **MR. JAMES:**  I have no further questions, Your Honor.

10   **THE COURT:**  All right.  I'll recognize the witness as an

11   expert and allow his opinions.  I think you might have been

12   here before.

13   **DR. SALEH:**  I believe so, yes.  Not in this room.

14   **THE COURT:**  Not here, in Raleigh.

15   **DR. SALEH:**  I was in Raleigh, yes, sir.

16   **THE COURT:**  Okay.  Thank you.  We'll take a recess now

17   until two o'clock and resume with your witness then.

18   **MR. TARLTON:**  Yes, Your Honor.

19            (Lunch recess 12:47 - 2:07 p.m.)

20   **THE COURT:**  Are you ready with your next witness?

21   **MR. TARLTON:**  Yes, Your Honor.  Our last witness is Dr.

22   Plaud, Your Honor.

23        **DR, JOSEPH J. PLAUD, RESPONDENT'S WITNESS, SWORN**

24                  <u>DIRECT EXAMINATION</u>

25   **DR. PLAUD:**  Good afternoon, Judge.

1   **BY MR. TARLTON:**

2   Q.   Good afternoon, Dr. Plaud.

3   A.   Good afternoon.

4   Q.   Under the meaning of the Adam Walsh Act, is Richard

5   Schmidt sexually dangerous?

6   A.   He is not.

7   Q.   Why not?

8   A.   As I've analyzed this case, Judge, over the last year

9   or so, I've interviewed Mr. Schmidt two times, gone through

10  all the data, the records.  This is a very good case where

11  the current status matters.  And because of the current

12  status, because of his current age, 75 years old, because

13  of the fact that in his long term of incarceration, for the

14  better part of 14 plus years in the federal system, there's

15  no evidence of inability to control himself sexually.  And

16  because of the nature of his offending itself or in the

17  course of it, I cannot conclude with any degree of

18  credibility, of scientific psychological certainty that

19  because of his diagnostic condition, that being pedophilic

20  disorder, which I do diagnose in this case, that he would

21  have at this time serious difficulty refraining from

22  further acts of child molestation if he were released from

23  custody at Butner.  That's underscored and emphasized by

24  the fact that he has lifetime supervision.  Now, does Mr.

25  Schmidt have issues?  Yes.  Some of them I have heard being

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 106 of 134

1     discussed here today in this court.  Like Dr. Saleh, I
2     diagnose Mr. Schmidt with a nonexclusive type of pedophilic
3     disorder and for pretty much the same reason that I heard
4     articulated earlier, meaning it is not clear to me by his
5     own statements, which I have no reason not to judge because
6     he is basically admitting to the essence of pedophilic
7     disorder as a condition, but that it goes beyond the
8     prepubescent area into pubescence.  So I would diagnose him
9     with a nonexclusive type of pedophilic disorder.  It is in
10    this case a necessary but not sufficient finding for the
11    third prong in that as a 75 year old man released in 2018
12    to the conditions of lifetime supervision with monitoring
13    and treatment that he would have serious difficulty in
14    refraining from further acts of child molestation.  You
15    just, in my judgment, can't go there given the data base.
16    Clearly he has a long history of offending.  I would note
17    and it's difficult for me when I testify in these cases
18    sometimes when they have conduct like we have in this case.
19    As a psychologist who had done work in this area now for
20    over 30 years, I've seen it all.  And I mean all.  As a
21    Judge who has presided over many of these cases over the
22    last almost coming up ten years now, so you've seen it all
23    pretty much.
24        If we look topographically at Mr. Schmidt's conduct,
25    he engaged in a number of acts over a number of years with

1  prepubescent/pubescent male children that was sexually
2  abusive in nature.  However, it was of a limited topography
3  in a sense that it did not involve penetration, attempts at
4  penetration or other types of sexual abuse that we see very
5  often in individuals who have very difficult issues in the
6  control of their sexual behavior if they are sexually
7  aroused,  It involves a modus operandi over the years in
8  which Mr. Schmidt himself did not engage in sexual abuse by
9  being what I would typically call a snatch and grab
10 offender who would hang out in high risk situations: parks,
11 playgrounds, schools and the like and find victims that
12 way, on a whim, on an impulse.  Again, which would
13 correlate, I think, with lack of volitional capacity over
14 his sexual impulses.  He's not that type of offender, never
15 has been.  He has developed relationships.  I think part of
16 that has been in the context of his ongoing struggles
17 through the years to understand himself emotionally and
18 sexually.  So you have a situation now where the guy is 75
19 years old.  He is not a behavioral problem.  He is not
20 motivated in any way by underlying psychopathic or
21 sociopathic lifestyle orientation.   He's not antisocial,
22 he's not a rule breaker.  He doesn't live for the purpose
23 of defeating others or causing harm or injury or reckless
24 disregard for their safety.  That's not him, never has
25 been.  He has engaged in bad decision making repeatedly

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 108 of 134

1    when he was a younger person for many reasons, but I do not

2    believe he was compulsively driven to engage in that

3    behavior.

4        Fast forward.  Now I have to make a judgment today.

5    And to say that a man -- okay, he's in good health.  I

6    don't even know if I'm going to make it to 75.  If I was in

7    his health at age 75.  I have trouble with my penis now.

8    My medication list is bigger than his right now, so I

9    understand the point.  He's not in the worst shape

10   physically that I've seen for a man who's 50 never mind 75.

11   But you can't, therefore, dismiss the fact that he is 75

12   years old.  Because it's not only when you look at

13   comparative research on recidivism and age, which some

14   experts may discount for various reasons without any real

15   good explanation I might add.  But that's only looking

16   backward.  You have to look forward too.  You have to look

17   forward and say, how long does this guy realistically have

18   to live.  You know, we talk about actuarials and we kind of

19   misapply them to the Static-99.  It's not really an

20   actuarial tool.  It's a comparative statistical risk.  But

21   if you want to look at real actuarial data, the question

22   is, well, how much longer has this guy got to live, period,

23   regardless of how good his health is right now.  You have

24   to judge risk based on time going forward.  So that's a big

25   part.  And that's why age is important regardless of trying

1   to discount it in the past.  You have to go forward.  This
2   is about him today and tomorrow.  If he was just to be
3   reconvicted for what he has already served 14 years, then
4   let's just do that.  But this is about him going forward.
5   So actuarial data in that sense means he's got a limited,
6   constrained temporal period to go, even given his health
7   status right now.  When he's released he's not just going
8   to be given a bus ticket and a pat on the head and send him
9   on his way somewhere.  He's going to have supervised
10  release.  And it's going to include monitoring.  It's going
11  to include treatment.  And I do believe he needs treatment.
12  And I want to see him have treatment.  But I think the risk
13  in this case here in 2018, given all that consideration, is
14  best and most appropriately managed through that lifetime
15  supervision with treatment and monitoring, period.  If he
16  was the type of offender historically who engaged in a lot
17  of very risky sexually abusive behavior with lots of
18  stranger victims, not developing relationships, engaging in
19  a wide range of sexually abusive topographic behavior, I
20  would temper some of my findings and remarks here.  But
21  he's not that way.  And you can't discount the last 15
22  years.  So when you put all that together, does he meet
23  Prong 1, yes.  Does he have a serious mental illness,
24  abnormality or disorder, yes, he does.  Will that disorder
25  in 2018 as we move forward, given his age of 75, given the

1  terms of supervision, given the history of his own

2  offensive conduct, given the complete absence of any risk

3  relevant behaviors in the last 14 years, which has figured

4  in a number of appellate cases in these federal cases, the

5  Antoine decision, the Wooden decision.  I can't say that

6  Mr. Schmidt has serious difficulty going forward in

7  refraining, so he is not sexually dangerous.  The data does

8  not support that professional conclusion.

9  Q.   Dr. Plaud, you heard the idea advanced today from Dr.

10  Zinik that if he's not in contact with children he's in

11  denial of his very essence or existence.  What, if any,

12  thoughts do you have about that assertion?

13  A.   Pitch that to me another way.  I want to make sure I

14  get it.

15  Q.   If he's not talking and around children then it's the

16  denial of who he is at his core.

17  A.   Well, look, he certainly engaged in cognitively

18  distorted thinking over the years.  What's interesting in

19  the interview and in the interviews that I've read in other

20  reports in this case, the other experts, as well as his

21  testimony on the stand.  He recognizes he had some serious,

22  significant and pervasive thinking errors.  He had

23  cognitively distorted thinking.  And he gave himself

24  permission to engage in this behavior.  He modified it a

25  little bit as he got older, but he ultimately, even when he

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 111 of 134

1    brought it out of the country -- and I wonder if he didn't
2    go out of the country, which he will never be able to do
3    going forward again.  He won't be able to.  There's a zero
4    percent chance he's going to leave the United States of
5    America if he walks out of these two front doors today,
6    zero.  Well, the question is, even if you go back 15 plus
7    years, the nature of his distorted thinking and his pattern
8    of abusive conduct, absent that going out to Cambodia, to
9    the Philippines, would he have even engaged in that
10   behavior here.  And I have my doubts.  Fifteen years ago.
11   But what happened, changed environments dramatically,
12   entire situation.  The cultural situation is so much
13   different over there.  That's why people --  offenders have
14   taken advantage of that situation in ways they couldn't and
15   wouldn't here in America.  That's precluded from his future
16   under supervised release.  If he gets supervised release he
17   has to have a passport and they stamp your passport now if
18   you're a sex offender, even if you had one.
19        So the situation has to be based on what are the
20   relevant risk factors going forward 2018 and beyond.  And
21   if you look past the actuarial, then we only have a limited
22   time window here to deal with in terms of going forward and
23   our risk analysis is a fact that he, Mr. Schmidt, has
24   engaged in cognitively distorted thinking, and he
25   recognizes the basis of some of that distorted thinking.

1   He understands for whatever reasons.  We could sit here and
2   argue this for days why he is the way he is, but at the end
3   of the analysis, that's not really -- that's up for
4   therapists and God to figure out.  The question is risk.
5   And he will have treatment to continue to address those
6   cognitive distortions as he moves forward under a lifetime
7   supervised release, period.
8   Q.    In your reports you distinguish from an opportunistic
9   history versus compulsively driven history.  Can you
10  elaborate on that a little bit?
11  A.    Yeah.  Look, I think every expert I've heard testimony
12  in this case, I've heard the Judge talk a bit about this
13  and think about this as he tries to conceptualize this
14  case.  But what's up with this guy?  I mean he wasn't
15  abused as a child himself, by his own admission.  So many
16  of these clients are.  We can use that maybe as a
17  touchstone for why they started engaging in this behavior.
18  I mean he clearly is and I think we all agree
19  diagnostically that he is somehow fixated in this
20  prepubescent to pubescent range of sexual sex, secondary
21  sex characteristics that are basically below the age of 18
22  years old.  And treatment obviously will be addressed for
23  him to try to explore that further and figure out why, but
24  he is fixed in that sense, yes.  And I don't think there is
25  any -- we can quibble a little with the parts of the

1    diagnoses that we make in terms of whether it is exclusive

2    or not, the pedophilic disorder.  But we all agree.  I mean

3    I agree as much as anybody that he has this disorder for

4    whatever the reason or reasons are.  The question is, he's

5    not -- these issues in the past have been opportunistic for

6    him.  He's had this underlying condition.  He's been in

7    positions, whether that be through seeing himself as a

8    mentor or teacher where he has been able to groom victims

9    over periods of time.  And when you load up your risk

10   factors, you add time in it and lack of supervision and

11   you're still acting on your cognitive distortions,

12   sometimes further offenses happen, and they certainly did

13   in this case.  The question is, will that scenario, that

14   situation, that environment, going forward in 2018 and

15   beyond even have the remotest possibility of being

16   recreated.  I don't think so.  So, again, I don't look at

17   it as compulsively driven, but he took advantage of

18   opportunities that were consistent with his underlying

19   sexual behavior.

20   Q.    Would it be fair to say that the deterrence of being

21   essentially subject to another civil commitment hearing

22   would actually mean something to Mr. Schmidt if he violated

23   his supervised release?

24   A.    Yeah, he's clearly aware of it.  I mean he's -- look,

25   there's quite a range of intellectual abilities by the

1    clients that I deal with in these SDP cases, whether that's

2    federal or state cases.  Most of them I would say, in my

3    judgment, are kind of on the mid to lower end of the

4    spectrum when it comes to means and analyses, cognitive

5    functioning, intellectual capabilities and attainments.

6    Mr. Schmidt is on the higher end of that.  He certainly

7    clearly  understands where he's at, where he needs to go

8    and what he needs to do going forward.  To my mind, does he

9    understand everything about himself sexually, no.  But

10   that's what our patient treatment will do to help him as he

11   moves forward.  He certainly does have an understanding of

12   the cognitive distortions that have motivated or propelled

13   his sexual abusive behavior in the past, and he has

14   articulated some of that when he was on the witness stand.

15   We talked about it in my interviews, my two interviews with

16   him, and I've seen it reflected in other expert reports.

17   Q.   Dr. Zinik opined that he has a paraphilia or subset

18   that makes him a much greater risk than other folks that

19   suffer from the same paraphilia, generally speaking.  What

20   are your thoughts on that?

21   A.   Well, if I got his testimony correct, my memory of it

22   was not that he had another paraphilia but that that he is

23   a nonexclusive type, which I don't diagnose.  But assuming

24   that's correct that that would automatically make you

25   riskier.  Now that's not necessarily true.  As a matter of

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 115 of 134

1    fact I've been in many cases where they argue just the
2    opposite.  Well, if a person has access to a wife or a
3    girlfriend or somebody who is normative and they're still
4    offending, that makes them an even higher risk.  So they
5    want to have it both ways.  No, it's not that case.  First
6    of all, he's not exclusive, so I disagree with the premise.
7    But beyond the premise, no, I disagree with that analysis
8    that makes him a higher risk per se.
9    Q.   With his diagnosis if he actually had a volitional
10   impairment, what would you have expected to see in the last
11   14 years or so while he has been incarcerated
12   A.   Well, I would have expected -- even going back further
13   than 14 years, I would have expected a different pattern of
14   offending throughout his life, first of all.  But in the
15   last 14 years, again, there is no evidence that he is
16   compelled, driven, to engage in behavior that involves
17   sexual gratification surrounding any issue involving
18   pubescent or prepubescent age children, none.  So he's
19   clearly controlling himself.  Now, it's not in the
20   community but, again, how many cases have we had.  These
21   guys are up to all kinds of shenanigans back there that are
22   a direct or indirect expression of ongoing difficulties in
23   controlling themselves sexually.  He's not doing any of
24   that, never has.
25   Q.   You reviewed probation's letter about his release

1    conditions?

2    A.    Yeah.  I think I quoted some of it in my report, if I

3    remember correctly, yeah.  I was very interested to see

4    what, in this case it was a very important part of my

5    analysis in this case concerning his terms of supervised

6    release.

7    Q.    And even the recommendation about placement in a

8    halfway house?

9    A.    Yes.

10   Q.    They would help arrange that?

11   A.    Correct.

12   Q.    Do you agree with that?

13   A.    I do.

14   Q.    Are there any other thoughts that you have that this

15   Court should know about this case?

16   A.    Well, I don't think he's sexually dangerous.  That's

17   my professional opinion because we're basing this on 2018

18   going forward.  For a 75 year old man with his offense

19   history, with no institutional issues who's got a lifetime

20   term of supervised release with very strong conditions.  It

21   is not -- in no way is a 75 year old man, opine in the

22   affirmative, given an absence of dynamic risk factors

23   present today, that he is going to reoffend.

24   Q.    Okay.

25        **MR. TARLTON:**  No further questions, Your Honor.

1    **THE COURT:**  All right.  Any cross?

2    **MR. JAMES:**  Yes, sir, thank you.

3                           CROSS-EXAMINATION

4    **BY MR. JAMES:**

5    Q.   Dr. Plaud, I believe you opined a few moments ago that

6    one of the factors that you considered was the fact that he

7    would have placement in a halfway house?

8    A.   It was in the record, that's correct.

9    Q.   That was in the record.

10   A.   Yes.

11   Q.   Now, placement in a halfway house was something that

12   was also recommended during his last day in court

13   convictions; is that correct?

14   A.   That's right.  I'm well aware of that.  I think I

15   point that out too somewhere, about supervised release

16   issues in the past, yes.

17   Q.   Now you cite the fact during the course of your

18   testimony that -- you reference the time that Mr. Schmidt

19   has been in prison in the last 14 years as being one of the

20   factors that you consider to be important as to why he

21   would not be sexually dangerous under Prong 3?

22   A.   Correct.

23   Q.   Of course, as you noted, his victim pool is not in

24   prison, obviously?

25   A.   Correct.

1  Q.   Correct?

2  A.   Correct.

3  Q.   Now with regard to his emotional congruence with

4  children, do you believe that is a factor, a risk factor

5  with him?

6  A.   Well, I love these terms, emotional congruence with

7  children.  I diagnosed him with a pedophilic disorder, so I

8  think that's the more important conclusion.  Yes, he does

9  have an emotional congruence with children.  He's got a

10  paraphilia disorder.

11  Q.   All right.  So your answer is yes?

12  A.   Yes.

13  Q.   All right.  Now, in your interview with Mr. Schmidt

14  and your review of the record, obviously indicates that he

15  spent from '87 to 2000 incarcerated, right?

16  A.   Correct.

17  Q.   And in your clinical interview and your review of the

18  records, there was nothing showing that although he has

19  this emotional congruence with children he was without an

20  ability to be with children that he acted out in any

21  manner?

22  A.   I think I pointed that out in my direct testimony.

23  Never in any of his incarcerations have I seen any evidence

24  of this.

25  Q.   Right.  And that's similar to his current

1    incarceration?

2    A.    Correct.

3    Q.    And all of his incarcerations?

4    A.    Everyone of them that I have any records of, that's

5    right.

6    Q.    Now you were asked -- there was some questions

7    regarding opportunistic sexual offenders and compulsive

8    sexual offenders?

9    A.    Yeah, I think it's critical, yes.

10   Q.    And in fact you know that many child molesters are

11   patient.  They groom children, as Mr. Schmidt has done.

12   A.    I would say probably most offenders have grooming

13   types of behaviors that you've described, yes.

14   Q.    They ingratiate themselves with the childrens' parents

15   as Mr. Schmidt has done?

16   A.    In the past, correct.

17   Q.    And they are sex offenders; isn't that correct?

18   They are still offending sexually?

19   A.    Yes, they are.  And that goes into my calculus and it

20   underscores I think what is not a risk factor in this case.

21   And that is he will not have the opportunity, even if that

22   was still present as it was decades ago, and I don't

23   believe it is, but for the sake of argument since you

24   brought it up in your question, say it was.  He will not

25   have the opportunity to engage in that grooming type of

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 120 of 134

1  predation given the situation that will be in effect once
2  he is released in 2018.  It's a different situation.  And I
3  have my doubts whether he would have done it if not for him
4  relocating outside the country back after 2000.
5  Q.  Well, back to the first part of your response, you
6  have not been in contact with the probation officer
7  yourself; is that correct?
8  A.  No, I just summarized his records.
9  Q.  Okay.  And in fact you have no way of knowing how the
10  probation officer in Maryland would be able to supervise
11  him; is that correct?
12  A.  I don't have any firsthand knowledge of anything other
13  than my general knowledge of how supervised release works
14  and the specific information that was composed and
15  memorialized by his probation officer.
16  Q.  And using your generalized knowledge of supervised
17  release you know that probation officers aren't stationed
18  outside someone's home 24/7?
19  A.  No, but he will be wearing an ankle bracelet.  He will
20  be monitored 24/7 on an ankle bracelet.
21  Q.  Well, the ankle -- you understand, of course, that the
22  ankle bracelet will just say the location where someone is?
23  A.  Yes.
24  Q.  If it works properly, right?
25  A.  That's what it's designed to do.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 121 of 134

1    Q.   It wouldn't indicate whether he was staying at his

2    home and a 12 year old boy that he has ingratiated himself

3    by meeting the boy's family, that boy comes over to his

4    home.  Is that correct?

5    A.   It would not.

6    Q.   Now you talked about Mr. Schmidt evidencing some

7    cognitive distortion.

8    A.   Cognitive distortion, yes.

9    Q.   And you read his deposition?

10   A.   I did.

11   Q.   In fact, you read his deposition before you prepared

12   the second report?

13   A.   I did.

14   Q.   All right.  And on page 45 of his deposition, I was

15   asking Mr. Schmidt about the victim from -- the first

16   lacrosse victim, I'll call him that, the boy who played

17   lacrosse and Mr. Schmidt sponsored or partly sponsored the

18   team.

19   A.   That is my understanding.

20   Q.   And I was asking Mr. Schmidt how did this boy come

21   from being a boy who came to the store to winding up in Mr.

22   Schmidt's home.

23   A.   Uh-hum.

24   Q.   And my question was on page 45, line 18, question:

25   All right.  So I'm trying to get from how he comes to you

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 122 of 134

1    in that context that he winds up at your place.  So what --

2    what do you say to him?  What do you -- what do you do with

3    him?  How did he get there?

4        Mr. Schmidt's response: Well, he was very friendly.

5    We became friendly during that period of time.  And he was

6    interested in being with me, so I invited him to my house.

7        Question:  How did he express his interest in being

8    with you?

9        Answer on page 46. line 1: Just by asking if he could

10    come to the store and showing a general interest.  Then the

11    next sentence: During that period of time, I was not

12    involved with anybody else and he was friendly and

13    interested.

14        Isn't that cognitive distortion, thinking just because

15    the boy comes to the store that the boy is sexually

16    interested in him?

17    A.   Could be.

18    Q.   And that was -- the deposition was taken on the 25th

19    day of April of 2017.

20    A.   I don't remember the date.  I'll take your word for

21    it.

22    Q.   Well, it's Exhibit Number 17 in the exhibits.

23        Now, during the course of your interview with Mr.

24    Schmidt I believe you noted that with regard to sexual

25    fantasies he told you that he occasionally still had sexual

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646     sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 123 of 134

1    fantasies about teenage boys?

2    A.    Yes.

3    Q.    Is that correct?

4    A.    Yes, he did say that to me.  Exactly, yes.

5    Q.    And with regard to your report, on page 4 of your

6    report you looked at some of the BOP factors and one of the

7    factors you noted in your report -- in your report you had

8    a gap between 19-- I'm talking about number 2, by the way.

9    A.    Okay.  Thank you.

10   Q.    And under the conclusion you had a reference to the

11   gap between 1960 and 1984, a 24 year of potentially time in

12   the community.

13   A.    Right.

14   Q.    Now you read his deposition and you know that that is

15   incorrect, in reading his deposition; isn't that correct?

16   A.    Uhm --

17   Q.    Let me rephrase it.  Isn't it true that during the

18   course of his deposition Mr. Schmidt testified in his

19   deposition that between '73 and '79 when he was teaching,

20   right --

21   A.    Right.

22   Q.    -- between 1973 and '79 he was still engaging in

23   sexual contact with boys.

24   A.    Right.

25   Q.    So there wasn't a gap between 1960 and 1984 in which

1    he wasn't engaging in sexual offenses.

2    A.    That's not my point.  That's not why I say that.  I

3    agree with you factually, but I'm talking about detection.

4    The issue is -- one of the big issues and this is reflected

5    in the Static-99 and other actuarial tools, another risk

6    assessment procedures is -- we oftentimes use the term

7    cluster offenses, is the actual intervention by law

8    enforcement, whether that involves arrest, trial,

9    conviction, but even arrest seems to be a significant

10   factor.  So an individual's engaging behavior for which

11   they are not being detected, there are other issues that we

12   have to consider.  So I'm really referencing that fact,

13   that it was not the intervention of the legal system until

14   much later.

15   Q.    Now Mr. Schmidt told that you he had engaged in sexual

16   activity with five or six males in the Philippines and in

17   Cambodia?

18   A.    Yes.  I did go into trying to find out if there was

19   any additional victims, correct.  That's my memory of what

20   he told me, yes.

21   **MR. JAMES:**  One moment, Your Honor.

22   Q.    When Mr. Schmidt testified today he stated that -- you

23   recall him testifying that he was aware that his activities

24   in 2000, the boy in 2000, was cause for a warrant?

25   A.    That's my recollection, yes.

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646     sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO   Document 62   Filed 01/22/18   Page 125 of 134

1  Q.   And despite being aware of that, he still engaged in

2  sexual activities with boys -- when he was in Cambodia and

3  the Philippines he engaged in sexual activity with boys?

4  A.   He did.

5  Q.   And Mr. Schmidt's testimony about his self-awareness

6  today would be the same as what he testified to in 2000?

7  A.   I'm not prepared to make that conclusion.  Certainly

8  he has had a decade and a half more to dwell upon these

9  issues.  I think his understanding is probably much more

10  acute today than it was back then.  You can't just make 15

11  years magically disappear here.  And that's why I'm very

12  pleased and would recommend that he receive ongoing

13  outpatient based sex offender treatment when he is released

14  under the terms of lifetime supervised release.

15  Q.   Did Mr. Schmidt indicate to you he had had any sex

16  offender treatment?

17  A.   I went over with him what I went over with you in

18  terms of what his terms were.  He indicated to me that he

19  would comply as best he could with all the terms of his

20  supervision, including engaging in outpatient sex offender

21  treatment, yes.

22  Q.   Do you believe that -- well, you heard Dr. Saleh's

23  testimony that he didn't believe that sex offender

24  treatment alone, outside of supervision, would be

25  sufficient for Mr. Schmidt because Mr. Schmidt doesn't

1    appear to be amenable to sex offender treatment because of
2    his ingrained (inaudible).

3    A.    I didn't hear the testimony that way.  Sex offender
4    treatment for the most part doesn't change.  Now, there are
5    some behavioral techniques.  In fact, I've worked on them
6    and published on them myself, but for the most part the
7    vast majority of issues we deal with in sex offender
8    treatment, it's not to change the underlying sexual
9    expression of the person, the underlying sexual impulses.
10   What it is is to teach them behavioral, cognitive and
11   behavioral skills to be able to make better decisions when
12   they are confronted with risk relevant situations.  That's
13   the essence of relapse prevention.  And so that's what I
14   would talk about.  I don't think if he underwent treatment
15   at Butner or in the community it's going to magically
16   change what his sexual interests are.  He admitted to me
17   during the interview within the last months that he still
18   has sexual fantasies about teenage boys.  So he's not even
19   trying to cover it up or hide it.  But he understands he
20   can't do it.  This is about the doing, not what he is.  He
21   is what he if for whatever the reasons are.  It's about not
22   acting on it.  That's what this is about.  What's the
23   likelihood that he is going to act on it going forward in
24   time as a 75 year old man with all these conditions on him
25   who has an understanding that what he has done is wrong.

1    That's the question.

2    Q.   When you look at Mr. Schmidt's compliance with rules

3    and regulations, he has violated probation and parole,

4    every single judge's order that he not engage in behavior

5    while he is on probation and parole.  At least with regard

6    to children he has violated that.

7    A.   I point that out.  I'm well aware of it, yes.  But

8    that's then; this is now.

9    **MR. JAMES:**  No further questions, Your Honor.

10   **THE COURT:**  Any redirect?

11   **MR. TARLTON:**  Nothing further, Your Honor.

12   **THE COURT:**  Thank you, Doctor.  Any other witnesses?

13   **MR. TARLTON:**  No, Your Honor.

14   **THE COURT:**  Okay.  You had a motion to dismiss for statute

15   of limitations?

16   **MR. TARLTON:**  That's right, Your Honor.  I've looked at the

17   (inaudible) argument back in October.

18   **THE COURT:**  In the Supreme Court or the Fourth Circuit?

19   **MR. TARLTON:**  Fourth Circuit, Your Honor, a three judge

20   panel.

21   **THE COURT:**  The claim is that when the first incarceration

22   or in this case when the 2001 or 2002 incarceration

23   happened that the Government was put to the test of

24   choosing to civilly commit him or making him subject to

25   civil commitment or else they lose that?

1    **MR. TARLTON:** At least that's when the accrual begins, that

2    they had the statute in effect and the accrual begins

3    because frankly the certification is based on the PSR. So

4    they had all the information present.

5    **THE COURT:** Well, there wasn't an Adam Walsh Act at the

6    time.

7    **MR. TARLTON:** After 2006 there was. It accrued once the

8    Adam Walsh Act came into effect and they had sufficient

9    information to do the diagnosis. That's the arguments that

10    were advanced on behalf of Mr. Searcy in the Fourth

11    Circuit.

12    **THE COURT:** And who is litigating that?

13    **MR. TARLTON:** Eric Brignac in the Federal Defender's office

14    is the --

15    **THE COURT:** In your office?

16    **MR. TARLTON:** No, in the Federal Public Defender's Office.

17    **THE COURT:** In the Eastern District?

18    **MR. TARLTON:** Yes, Your Honor.

19    **THE COURT:** Well, it would have to be here. We've got all

20    the cases.

21    **MR. TARLTON:** There is a period time line. I think it's

22    five years or four years is the statute that governs civil

23    actions. And then it's just the outcome -- this is a civil

24    regime. And the statute applies absent some express

25    language to the contrary.

1    **THE COURT:**  Who ruled on that, which Judge?

2    **MR. JAMES:**  The initial ruling on Searcy was a Flanagan

3    case.

4    **THE COURT:**  Judge Flanagan.

5    **MR. JAMES:**  Judge Flanagan.  And oral argument in that case

6    was held in October of 2016.

7    **THE COURT:**  Is there a statute of limitations?

8    **MR. JAMES:**  Our argument there is not.  That it does not

9    apply to Adam Walsh Act cases.  That's our argument before

10   the Fourth Circuit.

11   **THE COURT:**  Without getting into detail, why is that,

12   because you can't deny that it's a civil action.

13   **MR. JAMES:**  Right.  But when you look at the civil

14   commitment schemes -- normally the civil actions in which

15   the statute of limitations apply, they are designed to put

16   a plaintiff on notice and also allow a defendant to either

17   --

18   **THE COURT:**  Yeah, I know the process and I would think that

19   if anything once you had to make a decision about

20   certification that that might run the statute of

21   limitations, but not until a person was put to the

22   certification.

23   **MR. JAMES:**  That came up during oral arguments, Your Honor.

24   That came up -- I can't remember the appellate judge.

25   **THE COURT:**  Thacker or Harris?

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

Case 5:17-hc-02008-BO  Document 62  Filed 01/22/18  Page 130 of 134

1     **MR. JAMES:**  I believe it was Judge Harris who posed that

2     question.  And during the precertification evaluation

3     process, specifically in the Searcy case, well, he provided

4     new information.  And so the only issue was the accrual

5     date.  He provided new information.  If I remember

6     correctly Mr. Searcy admitted something he had never

7     admitted before about molesting one of the victims, and

8     that was also new information.

9     **THE COURT:**  Well, you don't know whether you're going to be

10    certified until the certification decision comes down.

11    **MR. JAMES:**  That's true.

12    **THE COURT:**  So how can -- a hundred percent of the people

13    who are examined -- we've had somebody here from Washington

14    in one of these cases who said we look at 5,000 and we pick

15    out 50.

16    **MR. JAMES:**  That's correct, Judge.  I know the case.  I

17    think it was the Goodpasture case.  But, you're correct.

18    They look at between 18 and 24 months before it expires for

19    release from imprisonment.  They look at that whole body of

20    prisoners who fall within that range.  And then they pare

21    out those who have convictions, primarily convictions.

22    And if you have one conviction, let's say, a 601

23    conviction, if that's all he has he will be excluded from

24    consideration.  If the person has two convictions and he

25    may have a disagreement between the bureau and a

1    psychologist they will bring in a third psychologist to
2    examine that.
3    **THE COURT:**  Well, Mr. Schmidt in this case was certified
4    when, in what year?
5    **MR. TARLTON:**  April 13, 2016, Your Honor.
6    **THE COURT:**  So this is the hearing and certification is
7    within four years of --
8    **MR. TARLTON:**  Well within that, yes.
9    **THE COURT:**  Well within that?
10   I'm going to deny the statute of limitations challenge.
11   **MR. TARLTON:**  Yes, Your Honor.
12   **THE COURT:**  And I'll review everything and give you a
13   written order.  No, we're not finished yet, right.  You
14   have another witness.
15   **MR. JAMES:**  We have another witness.
16   **THE COURT:**  And I'm prepared to hear that witness, if it's
17   convenient, on the morning of January 24th, which is a
18   Wednesday in Raleigh at ten o'clock.
19   **MR. JAMES:**  We will let that witness know, Judge.  One
20   other thing, if we haven't done so already, I know we
21   stipulated to all the experts, and the Court made mention
22   accepting a number of experts.  We are, of course,
23   tendering Dr. Watkins as well.
24   **THE COURT:**  Yes, I'll accept her as an expert.
25   **THE COURT:**  All right.  We'll resume.  I guess he'll need

1  to be there for that testimony, but we will just continue
2  the remainder of the trial until that day.
3  **MR. TARLTON:**  Yes, Your Honor.  Your Honor, what is the
4  specific date?
5  **THE COURT:**  The 24th, which is a Wednesday.
6  **MR. JAMES:**  May I approach.  We did file yesterday -- was
7  it this morning -- this morning a notice to the Court of
8  proposed dates.
9  (Counsel confer)
10  **MR. TARLTON:**  I just wasn't available in February.
11  **MR. JAMES:**  Would the Court allow us to contact the Court
12  with regard to January 24th?
13  **THE COURT:**  Yes.  I'm just advising you that I will be
14  available on the 24th, the 25th or the 26th in Raleigh.
15  And we won't need to come back here to Elizabeth City that
16  way.  And if you find a time that's convenient for your
17  witness we'll do it then.
18  **MR. JAMES:**  Okay.  Thank you, Judge.
19  **THE COURT:**  Thank you.  We'll be in recess.
20  Court recess 2:49 p.m.
21
22
23
24
25

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com

STATE OF NORTH CAROLINA          )
                                 ) C-E-R-T-I-F-I-C-A-T-I-O-N
COUNTY OF PERQUIMANS             )


       I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


*Sandra A. Graham, CVR-M*      *January 21, 2018*
Sandra A. Graham, CVR-M          January 21, 2018
Court Reporter & Notary Public
Notary Public Number:  19940140086

S. Graham & Associates
Court Reporting Services
P.O. Box 385
Elizabeth City, NC 27907-0385
(252) 264-4646    sgrahamassoc@gmail.com